**MARSH INVESTMENT CORPORATION, Plaintiff,**

v.

**John A. LANGFORD, Pontchartrain State Bank, et al., Defendants,**

**Crump London Underwriters, Inc., Eunice K. Langford, Third-Party Defendants.**

Civ. A. No. 79–2020.

United States District Court, E.D. Louisiana.

Dec. 22, 1982.

Don M. Richard, New Orleans, La., for third-party defendant Eunice K. Langford.

Marian Mayer Berkett, New Orleans, La., for third-party defendant Crump London Underwriters, Inc.

Robert C. Lowe, Michael R. Allweiss, New Orleans, La., for defendant Pontchartrain State Bank.

CASSIBRY, District Judge:

This case came on for hearing before the Court on October 25 and 26, 1982 on the third party demand by Pontchartrain State Bank ("the Bank") against a number of individuals out of Lloyd's ("Underwriters") on a banker's blanket bond and on a third party demand by the Bank against Eunice Langford Bristow to reinstate the obligations of Eunice Langford to the Bank. I had previously adjudicated the principal demand in this suit on a motion for summary judgment in favor of Marsh Investment Corporation and ordered cancellation of the mortgages in question. *Marsh Inv. Corp. v. Langford,* 490 F.Supp. 1320 (E.D.La.1980); *aff'd* 652 F.2d 583 (5th Cir.1981). The diversity jurisdiction of this Court has been established in prior proceedings.

*Findings of Fact*

I.

As of June 30, 1977, John Langford personally and through several of his companies was indebted to the Bank in the amount of $1,067,065.24. This indebtedness was secured by a $2,800,000 collateral mortgage on five acres of land on Belle Chasse Highway and a $1,000,000 mortgage on the New England Apartments in Gretna, Louisiana.

II.

Langford's mother, Eunice Langford Bristow, had signed two unsecured notes held by the Bank. These notes were for $74,766.32 and $263,481.78. In 1976, the Bank filed suit against Mrs. Langford on those notes.

III.

In 1977, discussions were held between John Langford and the Bank concerning the restructuring of his notes and his mother's notes.

IV.

Following these discussions, it was ultimately agreed that the Bank would dismiss its case against Mrs. Langford and cancel her notes if Langford would give the Bank a note for the combined indebtedness and secure it with a collateral mortgage note on property owned by Marsh Investment Corporation ("Marsh"). The mortgage was to be for $1,000,000. In addition, the Bank was to retain the mortgage on the five acres at Belle Chasse and to release the mortgage it held on the New England Apartments.

V.

The Bank knew that Langford was not a shareholder, officer, or director of Marsh.

VI.

As I stated in my decision on the main demand in this suit, "Marsh is a Louisiana corporation, formed by Carlos Marcello for the purpose of investing in real estate. Most of the stock in the corporation is owned by the family and friends of Carlos Marcello." *Marsh,* 490 F.Supp. at 1322. The Chief Executive Officer and President of the Bank during these transactions, James McKigney, testified that he knew Marcello and his son, Joseph, were involved with Marsh.

VII.

As noted by McKigney in a May 23, 1977 memorandum to his file, "it was determined that a unanimous consent of all shareholders of the corporation would be required to assure ourselves of Mr. Langford's authority for the above referenced action." Langford was represented in the restructuring of

his loans by Robert Stassi who was, at the time, a partner in the law firm Deutsch, Kerrigan & Stiles. Langford presented to Stassi a list of shareholders and consents of shareholders, which were purportedly executed by the shareholders of Marsh.

### VIII.

On June 18, 1977, Langford executed a collateral mortgage and note in the amount of $1,000,000 wherein he signed as an agent of Marsh, pursuant to an attached resolution signed by one "James Perez." These documents were executed to secure Langford's indebtedness to the Bank up to the sum of $1,000,000. The signature of James Perez was unauthorized since he was not in fact the secretary of Marsh.[1]

### IX.

No representative or agent of the Bank was present at the execution and passing of the collateral mortgage.

### X.

No funds were advanced to Langford when the various documents were executed.

### XI.

On July 1, 1977, the Bank received a letter from Robert Stassi, Langford's attorney, in which he informed the Bank that he had in his possession a list of the shareholders of Marsh and ten shareholder consent forms. He described the documents and then stated as follows:

I have not reviewed or even seen any charter, by-laws, stockbooks or any other documents of this corporation, nor have I conducted any investigation of this corporation whatsoever, even as to its existence. I make no representation or warranty, or give any opinion, that these people are in fact shareholders of Marsh Investment Corporation, or, if they are that they are the same people who signed these consent forms.

I will retain the above-mentioned consent forms and shareholder's list until the collateral mortgage note of Marsh Investment Corporation dated June 18, 1977, in the amount of $1,000,000.00 is released by you. If, prior to that time, you institute litigation on said note, and if deemed necessary by you, I will deliver said consent forms and shareholder's list to you.

### XII.

On the same date, July 1, 1977, the Bank received a preliminary title opinion prepared by Guy Smith of Deutsch, Kerrigan & Stiles. Smith indicated to the Bank that " . . . we are of the opinion that as of June 15, 1977, subject to the observations, comments and requirements set out below, the title to captioned property is vested as follows: MARSH INVESTMENT CORPORATION—100%". The opinion was subsequently supplemented.

### XIII.

Though one of the Bank's attorneys, Robert Mathis of Newman & Drolla, testified at trial that the Stassi letter was "cause for concern" and made them "suspicious," the Bank elected not to postpone the closing set for July 1, 1977. Stassi attended the closing; however, neither the Bank nor its attorneys inquired further about the documents or asked Stassi to permit them to see the documents.

### XIV.

On July 1, 1977, the Bank finalized its agreement with Langford as to the various obligations under the restructuring and recollateralization. The Bank took the collateral mortgage in pledge and released to Langford $52,516.77 and the collateral mortgage note it held on the New England Apartments. It also dismissed its suit against Mrs. Langford.

### XV.

When the foregoing action was taken on July 1, the Bank had never seen nor had

---

1. It has never been shown that Perez is, or was, "in fact" anything. "If James Perez exists at all, no one acknowledges that he is known to him." *Marsh,* 490 F.Supp. at 1323.

actual, physical possession of the list of Marsh shareholders, the shareholder consents, or what purported to be a certified copy of a corporate resolution.

## XVI.

During these transactions, the Bank did not attempt to contact Carlos Marcello, Joseph Marcello, James Perez, or any of the officers or directors of Marsh in order to ascertain the genuineness of Langford's authority to act for Marsh or the corporate actions presumably underlying that authority.

## XVII.

The Bank knew the reputation of Carlos Marcello. In addition, McKigney, who handled the Langford recollateralization, testified at trial that he "knew the fellow [Langford] wasn't paying his debts" and that, based on the Bank's records regarding Langford, "his credit risk was not real good."

## XVIII.

On September 7, 1977, the Board of Directors of the Bank held a special meeting in which the minutes record that:

Heavy discussion centered around the rebooking of the Langford loan. A question arose as to the validity of the mortgage since a corporate resolution from Marsh Investments was not obtained. It was pointed out that the Bank's attorneys have expressed an opinion that a unanimous consent of shareholders is stronger authority than a resolution.

## XIX.

In February, 1978, Langford executed a second collateral mortgage note on the Marsh property in the amount of $200,000. At the same time, the Bank released the mortgage on the Belle Chasse property to permit a sale of that property. The Bank received the proceeds of the sale.

## XX.

On March 17, 1978, after suit had been filed by Marsh, the Bank notified Underwriters of its intention to seek indemnification from Underwriters "in the event there was fraud in the execution of the aforedescribed mortgage." The Bank's third-party demand was filed on April 25, 1979.

## XXI.

The bond on which the suit is based is a banker's blanket bond. The particular provision of the bond on which the Bank sued Underwriters is Insuring Agreement (E).[2] Under clause (E), the bond provides a limit of $250,000 coverage with a deductible of $15,000.

---

2. Insuring Agreement (E) provided coverage for the following:

"Loss (1) through the Insured's having, in good faith and in the course of business, whether for its own account or for the account of others, in any representative, fiduciary, agency or any other capacity, either gratuitously or otherwise, purchased or otherwise acquired, accepted or received, or sold or delivered, or given any value, extended any credit or assumed any liability, on the faith of, or otherwise acted upon, any securities, documents or other written instruments which prove to have been

(a) counterfeited or forged as to the signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent or registrar, acceptor, surety or guarantor or as to the signature of any person signing in any other capacity . . .

Securities, documents or other written instruments shall be deemed to mean—

(a) original (including original counterparts) negotiable or non-negotiable agreements in writing . . . having value which value is, in the ordinary course of business, transferable by delivery of such agreements with any necessary endorsement or assignment . . .

Actual physical possession of such securities, documents or other written instruments by the Insured, its correspondent bank or other authorized representative is a condition precedent to the Insured's having relied on the faith of, or otherwise acted upon, such securities, documents, or other written instruments . . .

The word "counterfeited" as used in this Insuring Agreement shall be deemed to mean only an imitation of a security, document or other written instrument, as set forth in (a) above, which is intended to deceive and to be taken for an original."

*Conclusions of Law*

### A. The Bank's Claim Under the Banker's Blanket Bond Against Underwriters

#### I.

Insuring Agreement (E) sets forth a number of prerequisites to recovery under the bond. Regrettably, insofar as brevity is concerned, the parties have not been able to agree that any of these prerequisites have or have not been met. I take these items up one by one.

#### II.

As noted, clause (E) provided coverage for "loss." When Langford's loans were restructured, the Bank released $52,516.77 to Langford and, in addition, gave up the collateral mortgage note it had held on the New England Apartments. McKigney testified that the Bank fixed the value, as of July 1, 1977, of these apartments somewhere between $500,000 and $600,000. An appraiser estimated their "lump forced sale value" as of August 15, 1976 to be $582,000. Though I reserved to Underwriters the right to respond to this appraisal, the figure remains uncontroverted; hence, the Bank did sustain substantial loss as a result of the Langford recollateralization.

#### III.

A second requirement for recovery under clause (E) is that the "securities, documents or other written instruments" relied on by the Bank must have been in its "actual physical possession." This "condition precedent" limits the documents which the Bank could justifiably have relied on to the collateral mortgage, mortgage note, hand note and collateral pledge executed by Langford, and to the Guy Smith title opinion. No recovery could be permitted under clause (E) if the Bank relied on the shareholders' list, the shareholders' consents, or the corporate resolution for the simple reason that, within the intendment of the bond, the Bank never "possessed" these documents.

#### IV.

As to the documents the Bank possessed, it appears that they were originals and that they did have "value." Undefined in the bond, "value" is a term broad enough to encompass mortgages, mortgage notes, hand notes, and pledge agreements, which are "transferable by delivery ... with any necessary endorsement or assignment" by various methods. *See Union Investing Company v. Fidelity and Deposit Company of Maryland,* 400 F.Supp. 860 (E.D.Mich. 1975) *aff'd* 549 F.2d 1107, 1110 (6th Cir. 1977) (under clause (E), value "is to be construed in the ordinary and popular sense").

#### V.

Arching over all of the preceding discussion about "loss", originals, "possession", and "value", however, is the requirement that the Bank's actions were taken "in good faith." The meaning of "good faith" has not been the subject of extensive exegesis by courts in Louisiana.[3] In all likelihood, the absence of closely reasoned authority reflects the fact that the term simply is not and never will be amenable to precise definition. As a commentator in one arena puts it, "Good faith ranks among the most slippery concepts in the Code." J. White & R. Summers, Uniform Commercial Code § 17–3, at 663 (2d ed. 1980).[4]

---

**3.** Because the jurisdiction of this Court rests on diversity of citizenship, I must decide the case under principles of Louisiana law.

**4.** The origin of this slipperiness is both apparent and all too familiar:

The good faith requirement has been the source of a continuing and ancient dispute. The question has been whether courts are to apply a so-called objective test (i.e. if a reasonably prudent [financial institution] behaved the way the [Bank] behaved, would [it] have been in good faith?) or whether the test should be subjective (i.e. irrespective of a reasonably prudent [financial institution's] reaction to this circumstance, was this [Bank] acting in good faith, however stupid and negligent [its] behavior might have been?)

J. White & Summers, *supra* § 14–6, at 562.

Beyond the stated question, the possibility of a precise answer is rendered even more problematic when one notes that, in defining the subjective test, the authors do little more than

Though Louisiana has not adopted the Uniform Commercial Code (UCC) in its entirety, it has adopted the UCC's "General Definitions,"[5] one of which states that: " 'Good faith' means honesty in fact in the conduct or transaction concerned." La.Rev. Stat.Ann. 10: § 1–201 (West 1982).[6] Lacking guidance from the Louisiana courts, I begin with this definition as a starting point for analysis. Clearly, this provision of the UCC established "a subjective standard for measuring good faith, that is, good faith in fact—the old white heart and empty head standard." J. White & R. Summers, *supra* § 6–3, at 218. *See* E. Symons, Jr., "Letters of Credit: Fraud, Good Faith and the Basis for Injunctive Relief," 54 Tul.L. Rev. 338, 349 (1980) ("[t]he definition ... uses the 'subjective' standard ... and is applicable generally to all commercial transactions through Section 1–201").[7] Furthermore, the standard necessitates an intensive, detailed inquiry into the facts surrounding a transaction in order to determine just how "white" the heart, how "empty" the head.

## VI.

■ Actions taken out of ignorance, then, appear to be "in good faith." However, that broad statement of the law leaves an important question unanswered, one very relevant to this case: what if a person or entity *chooses* to remain ignorant, concerning the details of a transaction, in fear of what a little knowledge will disclose? In other words, is one acting "in good faith" when one practices selective ignorance? I conclude not and, for the following reasons, I find that the Bank did not act "in good faith" in the restructuring of Langford's loans.

repeat the words "in good faith." Essentially, the latter test asks "was the Bank acting in good faith if it was acting in good faith?"

5. This provision became effective January 1, 1975.

6. No Louisiana case has interpreted this definition.

## VII.

Referring solely to the Stassi letter of July 1, 1977, I stated in my earlier opinion that "it should have waved a sea of red flags indicating that additional investigation was necessary." *Marsh,* 490 F.Supp. at 1325. The testimony at trial only served to increase the density and illuminate the color of those flags.

In no particular order: the Bank knew that Langford was a poor credit risk. It knew that he was not connected in any official capacity with Marsh, that he was seeking to pledge the property of a third party for a personal debt. It knew the Marcellos were involved with Marsh. As made apparent by McKigney's May 23 memorandum, the Bank knew that it could not justifiably rely on the mortgage, notes, and pledge agreements, which were nothing more than Langford's unsupported representations and promises. Though realizing the absolute need for consents (as further demonstrated by the minutes of the September 7 directors' meeting), it took steps neither to see the consents nor to obtain further information about their validity. As to the corporate resolution, "[e]ven the most cursory examination of Marsh's corporate records would have revealed that no James Perez was ever connected with the corporation, and that no resolution authorizing Langford to mortgage the property to secure a loan on his (Langford's) behalf was ever considered by the board." *Marsh,* 490 F.Supp. at 1325.

At trial, McKigney and Mathis attempted to draw a great deal of solace and justification from the Smith title opinion. Yet the title opinion did no more and no less than any other title opinion: it stated that Marsh had good title to the property in question, which was undoubtedly true.

7. If the test were one of objective, reasonable standards, I would need to devote little discussion to this issue. No bank, intimately familiar with financial transactions of all sorts, could have acted as the Bank did in this case and be said to have followed a course of reasonably prudent behavior—whatever the precise dimensions of that phrase.

Mathis ultimately admitted that the opinion gave him "no comfort."

Repeatedly, McKigney and Mathis stated they were "suspicious" and felt "cause for concern" upon receipt of the Stassi letter. It was their position, however, that they could "rely" on the letter since it did not categorically state that something was amiss with the lists or consents. This position is untenable; if the Stassi letter was not a warning, there was, at the least, *nothing* in the letter on which the Bank could justifiably rely.

■ Apparently, no one at the Bank ever sought to talk to any person involved on the "other side" of the transaction about Langford's representations, not to the Marcellos, not to any official or shareholder of Marsh, not to Stassi, and, certainly, not to "James Perez." This course of deliberate inaction, of concerted ignorance, in the face of so many circumstances which fairly cried out for further investigation and scrutiny, leads me to the inescapable conclusion that the Bank did not act "in good faith."

## VIII.

Cases from other jurisdictions that have interpreted "good faith" support this conclusion. In *Community Bank v. Ell,* 278 Or. 417, 564 P.2d 685 (1977), the Supreme Court of Oregon, proceeding en banc and dealing with the Oregon equivalent of Louisiana's § 1–201 definition of good faith, held that:

> The appropriate standard is a subjective one, looking to the intent or state of mind of the party concerned ... Although mere negligence or failure to make the inquiries which a reasonably prudent person would make does not of itself amount to bad faith, if a party fails to make an inquiry for the purpose of remaining ignorant of facts which he believes or fears would disclose a defect in the transaction, he may be found to have acted in bad faith.

Id., 564 P.2d at 691 (footnote with citations omitted).

In *Hollywood Nat. Bank v. International Bus. Mach. Corp.,* 38 Cal.App.3d 607, 113 Cal.Rptr. 494 (1974), a bank made a loan to an individual it knew to be a poor credit risk. Although the individual was purportedly acting as an agent in obtaining the loan, the bank made no attempt to contact the principal or even to learn the principal's name. The loan was to be secured by a $70,000 IBM stock certificate in the name of a third party; however, the bank never tried to determine how the loan recipient had obtained the certificate, or how the loan recipient's poor credit record could be reconciled with the possession of such a certificate. In finding that the bank was not a holder in due course of the stock certificate, the California court stated that the bank's "studied refusal to make inquiries that were likely to 'disclose a vice or defect ...' in a rush transaction" supported a finding that the bank had not acted "in good faith." 113 Cal.Rptr. at 499. Finally, the most recent case to construe the "good faith" definition of the UCC tracks the same line of reasoning. *Seinfeld v. Commercial Bank & Trust Co.,* 405 So.2d 1039, 1042 (Fla.Dist.Ct.App.1981) ("playing dumb is not the same as being dumb").[8]

To be sure, the facts in each of these cases differed slightly from the instant one. Predictably enough, for, as I stated, the inquiry into a party's actions and whether those actions were taken "in good faith" must of necessity involve intense scrutiny into the facts surrounding a particular transaction. Nevertheless, their reasoning and my own persuade me that, as a matter of law, ignorance is one thing; selective, calculated ignorance is another. The Bank did not handle the Langford transaction "in good faith."

## IX.

For the sake of completeness, I turn to one final issue: the Bank's contention that

---

8. All three of these state court cases involved the holder in due course, or bona fide purchaser, section of the UCC. Here, of course, the Bank put itself forth as a bona fide lender—a distinction, but not a relevant difference. The subjective definition of "good faith" applies to all commercial transactions through § 1–203.

the mortgage, mortgage note, hand note, and collateral pledge delivered to the Bank at the July 1 closing were "forged as to the signature." [9] Leaving aside the fact that the Bank could not have relied on these unsupported documents "in good faith," the Bank argues that an unauthorized signature on the documents—that of Langford as agent for Marsh—created a forged document.

In support the Bank points to *Filor, Bullard & Smyth v. Insurance Co., etc.,* 605 F.2d 598 (2d Cir.1978). In *Filor,* the Court held that "forgery" in a brokers' blanket bond was an ambiguous term, that ambiguous terms must be construed against the insurer and, therefore, an unauthorized signature was a forged signature. Alternatively, the Court found that the embezzler "forged" the checks within the meaning of New York law by signing them without authorization.

While good authority for a broad definition of forgery, the case is inapposite insofar as Louisiana's law is concerned. In *Filor,* the Second Circuit hinged its finding of ambiguity *and* its estimation of New York law on a substantial revision in the New York penal law concerning forgery. The 1967 revision expanded the definition of forgery to include "writings unauthentic because not authorized." Id. at 603. Based on this development in the law, the Court concluded the term "forgery" was, in turn, fraught with ambiguity and broadly defined under New York law.

■ In direct contrast to New York's law on forgery is the law in Louisiana. In *State v. Lebo,* 117 So. 829, 830 (1928), the Louisiana Supreme Court held that "In a prosecution for forgery, a defendant cannot be convicted of having falsely assumed to act as agent." Though old law, the case is still good law; hence, in Louisiana, signing

one's own name and representing that one has authority to give the writing in question is not forgery.[10] La.Rev.Stat.Ann. § 14:72 (West 1974). Furthermore, unlike the situation presented in *Filor,* there has been no "recent revision" in this state's law which might render ambiguous the term "forgery."

■ This conclusion is buttressed by the UCC definition of an unauthorized signature. In the same section that contains the definition of "good faith," the Code provides that an "'Unauthorized' signature or indorsement means one made without actual, implied or apparent authority and includes a forgery." La.Rev.Stat.Ann. 10: § 1–201. In contradistinction to the reasoning in *Filor,* this definition recognizes that "forged" is a narrower concept than "unauthorized"; they are not functional equivalents. "Unauthorized" signatures include all that have been "forged"; "forged" does not include all "unauthorized" signatures. Under the clear and unambiguous law of Louisiana, John Langford's signature on the various documents was "unauthorized" because he was not Marsh's agent, but the signature was not "forged" because he signed his own name.

B. The Bank's Claim Against Eunice Langford

I.

■ The facts regarding the novation of Eunice Langford's debt to the Bank are not disputed. All parties agree that the assumption of Mrs. Langford's obligations to the Bank by John Langford constituted a novation. Testimony at trial showed that she was an innocent party in the restructuring of the loans, did not participate in any of the negotiations, and received none of the funds from the notes she had previously signed.

---

9. Without a doubt, the corporate resolution and shareholder consents were forgeries; however, the evidence showed that these documents were never in the Bank's possession.

10. Differing views as to a broad versus narrow definition of forgery under federal statutes are also held by the courts of appeal. The Fifth Circuit, however, adheres to the narrow definition. *U.S. v. Hagerty,* 561 F.2d 1197, 1199 (1977) ("since appellant signed his own name to the instruments, there was no forgery under the so-called 'narrow rule' of forgery that apparently applies in this Circuit.")

The issue is whether the original obligation should be revived if the substituted obligation fails. Counsel for the Bank has directed me to a few law review commentaries which suggest somewhat that the new obligation must be valid before the old debt is fully extinguished. Aside from their limited weight as authority, these articles do not address the question of the *creditor's* negligence in the creation of a new obligation. Counsel for Mrs. Langford has sought valiantly to enlighten me on that point; however, from his authorities, I have gleaned little more than isolated dicta from lower state court cases to the effect that a creditor's negligence in allowing a novation *may* preclude reinstatement of the old obligation, if the original obligor is an innocent third party.

Nevertheless, I have already found that the Bank did not act "in good faith" in restructuring the Langford loans. Given this finding, it would be incongruous to allow the Bank to reinstate Mrs. Langford's original indebtedness. In the face of a panoply of suspicious circumstances, the Bank allowed Langford to substitute his personal obligation for his mother's. Not having acted "in good faith," the Bank cannot now go back and restore the status quo.

### CONCLUSION

Based on the aforementioned findings of fact and conclusions of law, I find that the Bank is not entitled to any indemnification from Underwriters and that Eunice Langford is released from any obligation to the Bank.