**MARSH INVESTMENT CORPORATION,**
Plaintiff,

v.

**John A. LANGFORD, et al., Defendants.**

**PONTCHARTRAIN STATE BANK,**
Defendant-Third-Party
Plaintiff-Appellant,

v.

**CRUMP LONDON UNDERWRITERS,**
INC. and Eunice K. Langford, Third-
Party Defendants-Appellees.

No. 83–3045.

United States Court of Appeals,
Fifth Circuit.

Dec. 27, 1983.

---

Sessions, Fishman, Rosenson, Boisfontaine & Nathan, Robert C. Lowe, Michael R. Allweiss, New Orleans, La., for defendant-third-party plaintiff-appellant.

Lemle, Kelleher, Kohlmeyer & Matthews, Don M. Richard, New Orleans, La., for Eunice Langford.

Deutsch, Kerrigan & Stiles, Marian Mayer Berkett, Matt J. Farley, New Orleans, La., for Crump London and third-party defendants-appellees.

Before GEE and GARWOOD, Circuit Judges, and EAST *, District Judge.

GEE, Circuit Judge:

This Louisiana diversity case stems from a bogus real estate mortgage granted some six years ago by one John Langford. By it he procured, among other things, the release of certain obligations owed the mortgagee bank by his mother, Eunice. Today, the mortgage cancelled and Langford a bankrupt, the bank seeks recovery on its blanket bond and the reinstatement of Langford's mother's obligations. The bank's appeal challenges the district court's denial of such relief.

### Facts

In the spring of 1977, Langford personally and through his companies owed the Pontchartrain State Bank over one million dollars. A collateral mortgage on five acres of land located on Belle Chasse Highway and a mortgage on the New England Apartments in Gretna, Louisiana, secured this debt. John's mother, Eunice, owed the bank about $350,000 on two unsecured notes. These were in default, and the bank had sued to collect them.

By an agreement between Langford and the bank, the debts of mother and son were restructured. It was agreed that the bank would dismiss the suit against Eunice and cancel her notes if Langford would give the bank a new note for the combined indebted-

---

* District Judge of the District of Oregon, sitting by designation.

ness and secure it with a collateral mortgage on some property owned by Marsh Investment Corporation ("Marsh"), even though the bank knew that Langford was neither an officer, a director nor a shareholder of Marsh. The bank retained the mortgage on the Belle Chasse property, but released the mortgage on the New England Apartments. Marsh was owned in large part by Carlos Marcello, a formidable local figure of some notoriety,[1] and by his friends and members of his family.

To validate the new mortgage, the bank required both a corporate resolution and the unanimous consent of all the Marsh shareholders to verify Langford's authority to encumber Marsh property. Langford was represented in this debt restructuring by Robert Stassi, a partner in a major New Orleans law firm. Stassi received from Langford both a purported corporate resolution authorizing the transaction, certified by a "James Perez" as corporate secretary, and a shareholder list, with purported consents from each. These last were not shown the bank but were by agreement held in safekeeping by Stassi, to be released only in the event of litigation. Stassi instead prepared an opinion for the bank, describing the shareholder documents and concluding as follows:

> I have not received or even seen any charter, by-laws, stock books or any other documents of this corporation, nor have I conducted any investigation of this corporation whatsoever, even as to its existence. I make no representation or warranty, or give any opinion, that these people are in fact shareholders of Marsh Investment Corporation, or, if they are

that they are the same people who signed these consent forms.

Despite this sweeping disclaimer—which attorneys for the bank testified concerned them and made them suspicious—and despite the other unusual aspects of the transaction, the bank did nothing further to verify Langford's authority to encumber the land of the third-party corporation, authority upon the exiguous thread of which its new security entirely depended.

Instead, relying on a title opinion that *Marsh* had good title to the properties, on the unseen shareholder consents, and on the unverified status of "James Perez" as corporate secretary of Marsh, it closed the transaction, releasing its lien on the New England Apartments, cancelling the note of Langford's mother, and dismissing its suit against her. This it did despite its knowledge of Marcello's dubious reputation and of Langford's poor credit rating. The following February, having received an additional title opinion from another member of Stassi's firm that its new mortgage was indeed valid, the bank advanced $200,000 more to Langford on the faith of the mortgage.

All was bogus. It turned out later that no "James Perez"—if any existed—was an officer of Marsh, that the shareholder consents were false, and that Langford had no authority to sign as agent for Marsh. Marsh sued to cancel the mortgages and won. *Marsh Inv. Co. v. Langford,* 490 F.Supp. 1320 (E.D.La.1980), *aff'd* 652 F.2d 583 (5th Cir.1981). Langford took bankruptcy. This suit followed.

In it the bank sought recovery on its blanket bond,[2] contending that Langford's

**1.** See, *e.g., United States v. District Director of Immigration,* 634 F.2d 964 (5th Cir.1981).

**2.** The pertinent provision of which, Insuring Agreement (E), provided coverage for the following:

> Loss (1) through the Insured's having, *in good faith* and in the course of business, whether for its own account or for the account of others, in any representative, fiduciary, agency or any other capacity, either gratuitously or otherwise, purchased or otherwise acquired, accepted or received, or sold or delivered, or given any value, extended

any credit or assumed any liability, on the faith of, or otherwise acted upon, any securities, documents or other written instruments which prove to have been (a) counterfeited or *forged as to the signature* of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent or registrar, acceptor, surety or guarantor or as to the signature of any person signing in any other capacity ...

> Securities, documents or other written instruments shall be deemed to mean—(a) original (including original counterparts) negotiable or non-negotiable agreements in

signature on the Marsh property mortgage was a forgery, and reinstatement of the released debts of Langford's mother, Eunice. After hearing evidence, the trial judge entered extensive findings of fact and conclusions of law. 554 F.Supp. 800 (E.D.La. 1982). In the former, he found the facts as we have stated them above. In the latter, he concluded that the bank did not act in good faith in the Langford transaction, that Langford's signature on the mortgage was not such a forgery as the terms of the bond contemplated,[3] and that the debts of Langford's mother would not—because of the bank's want of good faith in the transaction by which they were released—be revived. Before us, the bank attacks each of these determinations.

### The Bank's "Bad Faith"

We proceed directly to the heart of the case. The bank concedes that the trial court's definition of good faith/bad faith is correct: that mere ignorance is not bad faith, but that if one "chooses to remain ignorant ... in fear of what a little knowledge will disclose ..." such "selective ignorance" is bad faith. 554 F.Supp. at 805. Since the parties do not debate the question, and since the concept is a slippery one under Louisiana law,[4] we accept the appellant's concession for purposes of this appeal, leaving for another day any definitive pronouncement on this vexed question of state law. Nor need we decide whether the trial court's ultimate finding—want of good faith—is to be tested by the clearly erroneous standard of Rule 52(a), Federal Rules of Civil Procedure.[5] For given the trial court's findings of subsidiary historical fact detailed above, none of which is seriously disputed, we would affirm its ultimate finding on any standard of review.

■ Having summarized these already, we need not reiterate them at length. Suffice it to say that the bank, faced with an anomalous transaction that turned on the authority of one man—a poor credit risk, as it admitted—to mortgage the property of a corporation with which it knew he had little or no connection, and with the means of checking that authority lying as near as the closest telephone, failed in the face of what the trial court properly characterized as a veritable sea of red flags to lift a finger to verify that authority, choosing instead to proceed in ignorance and sole reliance on the debtor's critical representations about his own authority. If "selective ignorance" be the test, as it is for purposes of this appeal, it is amply demonstrated. Since it is, and since it is a sufficient basis for the trial court's judgment in favor of the bonding company, we need not explore the issue of forgery. We now turn to the bank's claim against Langford's mother.

### The Claim Against Langford's Mother

Even the equities of this issue are not clear. On the one hand stands the bank, victimized by Langford on his own behalf and that of his mother. A review of her testimony at trial reveals that her hands are not clean in the overall matter: by her

writing ... having value which value is, in the ordinary course of business, transferable by delivery of such agreements with any necessary endorsement or assignment ...

*Actual physical possession* of such securities, documents or other written instruments by the Insured, its correspondent bank or other authorized representative is a condition precedent to the Insured's having relied on the faith of, or otherwise acted upon, such securities, documents, or other written instruments ...

The word "counterfeited" as used in this Insuring Agreement shall be deemed to mean only an imitation of a security, document or other written instrument, as set forth in (a) above, which is intended to deceive and to be taken for an original. (emphasis added).

3. The shareholder instruments could not form a basis of recovery because the bank did not have actual physical possession of them at the relevant time.

4. See the trial court's discussion at 554 F.Supp. 804–805.

5. Were we required to decide, we incline to the view that the Rule applies, having so held in a very similar context. *United States v. Second National Bank of North Miami,* 502 F.2d 535 (5th Cir.1974).

own admission, she constituted Langford her universal agent to deal with the bank and instructed him to "get her out" with the bank from notes that she had executed "to help him," arming him on the earlier occasion with a financial statement signed by her in blank—one which was filled in to show a large and false net worth on her part and given to the bank. Through her agent's machinations on her behalf she first received hundreds of thousands of dollars in credit and now stands discharged of these, the beneficiary of her universal agent's fraud. On the other stands the bank, convicted of bad faith in the *release* transaction and facing a finding by the trial judge that Langford's mother "was an innocent party *in the restructuring of the loans,* did not participate in any of the negotiations, and received none of the funds from the notes she had previously signed." 554 F.Supp. at 807 (emphasis added).

The trial court's discussion of the issue is brief and dismissive, and its decision rests entirely upon its finding that the bank acted in bad faith in the restructuring transaction:

> The issue is whether the original obligation should be revived if the substituted obligation fails. Counsel for the Bank has directed me to a few law review commentaries which suggest somewhat that the new obligation must be valid before the old debt is fully extinguished. Aside from their limited weight as authority, these articles do not address the question of the *creditor's* negligence in the creation of a new obligation. Counsel for Mrs. Langford has sought valiantly to enlighten me on that point; however, from his authorities, I have gleaned little more than isolated dicta from lower state court cases to the effect that a creditor's negligence in allowing a novation *may* preclude reinstatement of the old obligation, if the original obligor is an innocent third party.
>
> Nevertheless, I have already found that the Bank did not act "in good faith" in restructuring the Langford loans. Given this finding, it would be incongruous to allow the Bank to reinstate Mrs. Lang-

ford's original indebtedness. In the face of a panoply of suspicious circumstances, the Bank allowed Langford to substitute his personal obligation for his mother's. Not having acted "in good faith," the Bank cannot now go back and restore the status quo. (emphasis original).

On this appeal, counsel for the bank and for Langford's mother press upon us complex contentions grounded in the Civil Code and the Louisiana doctrines of failure of cause, gross and slight fault, contractual negligence, and assumption of risk. Our study of the record reveals that some of these, at least, were advanced to the trial court, though none was addressed by it. Reviewing these, we are left in doubt whether the trial court's factual findings of bad faith by the bank and innocence of Langford's mother in the restructuring transaction *alone* furnish a sufficient basis under Louisiana law for its exoneration of one who placed it in the power of her agent to mislead the bank as to her financial status, issued him instructions to get her free of the transaction, and now stands scot-free of all obligation—the beneficiary of her agent's calculated fraud. Since we conclude that the court's subsidiary findings may not adequately support its judgment on this head and that the legal contentions advanced under Louisiana law regarding it have not been but should be first addressed by the trial court, we vacate its judgment in this respect only and remand for further proceedings regarding it, intimating no views of our own.

The judgment is in part AFFIRMED and in part VACATED, and the cause is REMANDED.