**NATIONAL CITY BANK OF MINNEAPOLIS, Appellant,**

v.

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Respondent.**

**No. C6–88–1378.**

Court of Appeals of Minnesota.

Jan. 17, 1989.

Review Granted March 17, 1989.

John H. Daniels, Jr., Robert R. Nardi, Willeke & Daniels, Minneapolis, for appellant.

Roderick D. Blanchard, Galen L. Bruer, Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, Minneapolis, for respondent.

Heard, considered and decided by PARKER, P.J., and FOLEY and RANDALL, JJ.

## OPINION

FOLEY, Judge.

National City Bank appeals from the April 6, 1988 declaratory judgment dismissing with prejudice its claim against respondent St. Paul Fire and Marine Insurance Company for indemnification under a bankers blanket bond. National City's claim arises as a result of loss incurred from a loan default secured by fake stock certificates. St. Paul noticed review on that portion of the trial court's judgment holding the condition precedent, i.e., the requirement that the bank have actual physical possession of the securities before making the loan, did not bar recovery. We affirm the trial court's finding that the condition precedent clause did not bar recovery, but we reverse dismissal of National City's claim for indemnification and remand for entry of judgment in favor of National City

in the amount of $194,000 plus interest, and consideration of an award of attorney fees in that court to National City.

### FACTS

This case of first impression involves interpretation of clause E of a bankers blanket bond. On December 17, 1981, National City loaned $194,000 to R.E. Clemens in good faith and in the course of business. This loan was secured by two stock certificates purporting to represent a total of 9,120 shares of stock owned by Clemens in the Panhandle Eastern Pipe Line Company. On December 31, 1981, the Federal Bureau of Investigation notified National City that Clemens' Panhandle stock certificates might not be genuine.

National City demanded Clemens repay the loan together with accrued interest. When Clemens defaulted, National City sought recovery from St. Paul under clause E of the bankers blanket bond for loss incurred due to counterfeit stock. St. Paul denied coverage, claiming National City had not complied with the condition precedent clause of the policy requiring actual physical possession of the certificates before making the loan. St. Paul also denied coverage, claiming the stock was not counterfeit within the meaning of the policy. This lawsuit followed.

The evidence shows Clemens had prepared or caused to be prepared two fake Panhandle stock certificates. Clemens actually owned four shares of Panhandle, none of which are involved in this matter. Although the fake certificates were not copies of genuine existing documents, they were clearly imitations of Panhandle's stock certificates, including forged signatures of Panhandle's president and secretary, and were intended to deceive and be taken for originals.

Clemens was referred to National City by an officer of another bank who was a long-time personal friend of Clemens. The senior vice president of National City met with Clemens, reviewed his financial statement, was satisfied the value of the 9,120 shares of Panhandle would adequately secure the loan, and orally approved the loan.

The Panhandle certificates were not reviewed at this time because another bank had physical possession of the certificates, as security for a loan Clemens intended to pay off with the National City loan proceeds. National City did communicate with the other bank by telephone and verified possession of the certificates. National City did not contact Panhandle to verify the authenticity of the certificates.

On December 18, 1981, National City prepared a letter on behalf of Clemens addressed to the other bank instructing it to "forward by messenger the 9,100 + shares of Panhandle Eastern Pipe Line Company (2 certificates) securing the loan" to National City. That same date, National City issued to Clemens a bank money order made payable to the other bank. Clemens delivered the money order and letter to the other bank.

On December 30, 1981, after the bank money order was collected, the other bank delivered the certificates to National City. Upon receipt, National City's loan officer reviewed the certificates and seeing nothing wrong with them, sent them to the vault. Neither National City nor the other bank have a policy that requires verifying stock certificates with the issuer of a publicly held company absent suspicious circumstances. National City then extended additional credit on the promissory note.

While the bankers blanket bond generally excludes coverages for loan losses, it does provide coverage for loan losses under Insuring Clause E, Forgery and Alteration of Securities, etc. In that clause coverage is extended for any loss

through the Insured's having, in good faith and in the course of business, * * * extended any credit * * * on the faith of, or otherwise acted upon, any securities, documents or other written instruments which prove to have been

(a) counterfeited or forged as to the signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent or registrar, acceptor, surety or guarantor or as to the signature of any person signing in any other capacity, or * * *.

It is uncontested that National City made the loan to Clemens in good faith and in the course of business. Stock certificates are "securities, documents or other written instruments" as used in clause E of the bankers blanket bond. In a declaratory judgment action, the trial court dismissed National City's claim with prejudice.

1. With respect to the actual physical possession clause, the trial court concluded: "The 'actual physical possession' clause of the bond was not complied with" by National City. Nevertheless, "its application is irrelevant and will not be used to deny coverage."

2. With respect to whether the securities were counterfeit, the trial court concluded:

> "Counterfeited" as defined in the Bankers Blanket Bond means a copy of an actual genuine document with respect to which an original is in existence.
>
> * * * The fake securities pledged by Mr. Clemens to National City Bank were not "counterfeited" within the meaning of the Bankers Blanket Bond.
>
> * * * The securities pledged by Mr. Clemens were not genuine in any way, therefore the term "forged as to signature" does not describe these securities. That term is meant to apply to only documents that are genuine to the point of signature and contain an unauthorized or incorrect signature.
>
> *   *   *   *   *   *
>
> * * * the loss here is a loss from a bad loan, a loan which was made in the ordinary course of the bank's business, and which should not have been made, but for the inappropriate representations of the borrower * * *.
>
> *   *   *   *   *   *
>
> * * * Compensable losses, had they been covered in this case include the principal amount advanced to Mr. Clemens in the sum of $194,000.00, together with interest at the prejudgment rate thereon from the time of the submission of the proof of loss herein to defendant, less the $21,400.00 received and applied to the principal on November 22, 1985.

Had plaintiff prevailed in this action, it would have been entitled to reasonable attorneys' fees and costs incurred by it in the prosecution of this action, as this action is in the nature of a declaratory judgment action for coverage.

3. With respect to the reasonable expectations doctrine, the trial court concluded: "The application of the reasonable expectations doctrine is not appropriate in this case." Both National City and St. Paul "are large commercial enterprises" and "no vast disparity of bargaining power exists."

4. With respect to whether National City was entitled to a jury trial, the trial court concluded:

> The application of the doctrine of reasonable expectations is in reality a request for reformation of a contract. Accordingly, because the Court has accepted the facts stipulated to and the offers of proof of the parties, and because the only remaining questions are questions of equity, contract interpretation, and law, plaintiff is not entitled to a jury trial on any matter raised in the pleadings. The written Stipulation of facts agreed to by the parties and their offers of proof constitute sufficient facts upon which the court can base its ruling.

## ISSUES

1. Did the trial court err when it held the condition precedent of the bond, i.e., the requirement that the bank have actual physical possession of the securities before making the loan, did not bar recovery?

2. Did the trial court err when it held the fake securities were not counterfeit within the meaning of the bond?

3. Did the trial court err by not applying the reasonable expectation doctrine?

4. Did the trial court err by concluding National City was not entitled to a jury trial?

## ANALYSIS

■ "Interpretation of the language of an insurance contract is a question of law, as applied to the facts presented." *Iowa Kemper Insurance Co. v. Stone*, 269 N.W.

2d 885, 887 (Minn.1978). The appellate court makes an independent review of the trial court's interpretation of an insurance contract involving questions of law. *Merchants National Bank v. Transamerica Insurance Co.*, 408 N.W.2d 651, 653 (Minn. Ct.App.1987), *pet. for rev. denied* (Minn. Sept. 30, 1987) (citing *Iowa Kemper*, 269 N.W.2d at 886–87).

### 1. *Actual Physical Possession Clause*

■ The trial court found the actual physical possession clause of the bankers blanket bond was not ambiguous and was not complied with by National City, but nevertheless, the clause did not bar recovery because (1) the law does not require a futile act and compliance would not have prevented the loss, and (2) the purposes [1] of the clause were served because National City would have made the loan in any event. We agree.

St. Paul noticed this issue for review and argues the clause is an express condition precedent relying on the bond language:

> Actual physical possession of such securities * * * by the Insured, its correspondent bank or authorized representative is a condition precedent to the Insured's having relied on the faith of, or otherwise acted upon, such securities * * *.

St. Paul argues this language bars recovery because National City admits it did not have actual physical possession of the securities at the time the loan was made and therefore did not rely on the faith of or otherwise act upon those securities.

In support, St. Paul cites a Fifth Circuit case where denial of bond recovery was upheld based upon a similar condition precedent clause. *See Marsh Investment Corp. v. Langford*, 554 F.Supp. 800 (E.D. La.1982), *aff'd in part, vacated in part on other grounds*, 721 F.2d 1011 (5th Cir. 1983), *cert. denied*, 454 U.S. 1163, 102 S.Ct. 1037, 71 L.Ed.2d 319 (1982). *Marsh* is distinguishable on its facts, however, based on the bad faith finding. *Id.* at 805–06. Here,

it is uncontested that National City made the loan to Clemens in good faith and in the course of business.

The trial court did not err when it held the actual physical possession clause did not bar recovery under these facts.

### 2. *Counterfeit Securities*

■ The trial court found the fake stock certificates were not counterfeit within the meaning of the bankers blanket bond and therefore the loss resulting from reliance on those certificates was not insured. National City argues the trial court erred when it went far beyond the bond definition and narrowly interpreted counterfeit to mean "a copy of an actual genuine document with respect to which an original is in existence." National City argues the trial court's conclusions are unsupported by the bond or the law and should be reversed.

The relevant part of clause E of the bankers blanket bond provides:

> The Underwriter agrees to indemnify the Insured * * * for any loss (1) through the Insured's having, in good faith and in the course of business * * * extended any credit * * * on the faith of, or otherwise acted upon, any securities, documents or other written instruments which prove to have been
>
> (a) counterfeited or forged as to the signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent or registrar, acceptor, surety or guarantor or as to the signature of any person signing in any other capacity, or * * *.

Clause E defines counterfeited as:

> The word "counterfeited" as used in this Insuring Clause shall be deemed to mean only an imitation of a security, document or other written instrument * * * which is intended to deceive and to be taken for an original.

---

1. The trial court found the purposes of the actual physical possession clause were twofold: (1) To assure the loss is incurred in reliance on the actual certificates rather than a mere promise on the part of the borrower to deliver the certifi-

cates at some future time; and (2) to give the insured, its correspondent bank, or other authorized representative an opportunity to examine the securities at the time of or prior to advancing funds.

As a general rule, when the terms of an insurance policy are of doubtful meaning, the construction most favorable to the insured will be adopted. *Bergholm v. Peoria Life Insurance Co.*, 284 U.S. 489, 492, 52 S.Ct. 230, 231, 76 L.Ed. 416 (1932); *Bobich v. Oja*, 258 Minn. 287, 294, 104 N.W.2d 19, 24 (1960). Language in bankers blanket bonds shall be given a broad and liberal interpretation and construed most strongly against the insurance company. *Shoals National Bank of Florence v. Home Indemnity Co.*, 384 F.Supp. 49, 51 (N.D.Ala. 1974), *aff'd* 515 F.2d 1182 (5th Cir.1975).

The issue turns on the meaning of "counterfeited" in clause E and the extent of coverage afforded by the counterfeit provision of the bond. Minnesota courts have not previously interpreted that meaning. Several of the circuit courts have, finding doubtful meaning of the language, but they are not in agreement on interpretation of that meaning. Most have not specifically considered counterfeit stock certificates, but rather have addressed fictitious chattel mortgages, fictitious accounts receivable, unsigned bills of lading, invalid warehouse receipts, worthless certificates of deposit, invalid automobile titles, fictitious manufacturer's statements of origin, and equipment liens securing non-existent equipment.[2]

The Fifth Circuit has specifically addressed the meaning of counterfeited in the context of counterfeit stock certificates, finding coverage under a similar clause E. *See American National Bank & Trust Co. of South Pasadena v. Fidelity & Casualty Co. of New York*, 431 F.2d 920 (5th Cir. 1970). In *American National Bank*, the borrower secured a loan with stock certificate No. 18 for 2,000 shares of Southern Bank, of which he was the president. When default occurred and the bank tried to collect on its security, the liquidator refused to honor the claim to the stock because other banks also held stock certificate No. 18 for 2,000 shares of Southern Bank.

The Fifth Circuit held the stock was counterfeit within the meaning of the bankers blanket bond, even though the signatures found thereon were valid. Recognizing that the crux of the problem was the meaning of "counterfeit or forged as to signatures," the Fifth Circuit aligned itself with the Second and Ninth Circuits' interpretation of the coverage afforded by the counterfeit provision of the bankers blanket bond and held that

> the counterfeit provision extends to and covers all losses as a result of value extended on the faith of counterfeit securities whether the counterfeit arises as a result of a non-genuine signature or in some other manner.

*American National Bank*, 431 F.2d at 923. The Fifth Circuit quoted the Ninth Circuit with approval:

> "A 'counterfeit' instrument is one that 'purports to be something that it is not.' Under the provisions of the bond in suit, a forged instrument is *ex necessitate* a 'counterfeit' instrument; but a 'counterfeit' instrument need not necessarily involve a forgery within insuring clause (E)."

*Id.* at 922 (quoting *United Pacific Insurance Co. v. Idaho First National Bank*, 378 F.2d 62, 69 (9th Cir.1967)).

The Fifth Circuit noted it had aligned itself with the Second Circuit on another issue of counterfeit coverage in *Maryland Casualty Co. v. State Bank & Trust Co.*, 425 F.2d 979 (5th Cir.1970). The Fifth Circuit quoted the Second Circuit with approval:

> "A document or writing is counterfeit if it is an imitation, if it attempts to

---

**2.** *Bank of the Southwest v. National Surety Co.*, 477 F.2d 73 (5th Cir.1973) (invalid automobile titles); *Whitney National Bank of New Orleans v. Transamerica Insurance Co.*, 476 F.2d 632 (3rd Cir.1973) (invalid warehouse receipts); *Maryland Casualty Co. v. State Bank & Trust Co.*, 425 F.2d 979 (5th Cir.1970), *cert. denied*, 400 U.S. 828, 91 S.Ct. 55, 27 L.Ed.2d 57 (1970) (invalid warehouse receipts); *Capitol Bank of Chi-*cago v. Fidelity & Casualty Co. of New York, 414 F.2d 986 (7th Cir.1969) (fictitious accounts receivable); *Exchange National Bank of Olean v. Insurance Co. of North America*, 341 F.2d 673 (2nd Cir.1965), *cert. denied*, 382 U.S. 816, 86 S.Ct. 37, 15 L.Ed.2d 63 (1965) (fictitious accounts receivable); *State Bank of Poplar Bluff v. Maryland Casualty Co.*, 289 F.2d 544 (8th Cir. 1961) (fictitious chattel mortgages).

simulate another document or writing which is authentic. The deceptive and fraudulent quality of these invoices, however, arose, not from the effort to imitate or simulate authentic invoices, but from falsity of the implicit and explicit representations of fact, to wit, that certain goods had already been shipped to a customer. To hold that these invoices are counterfeit would obliterate elementary distinctions among the techniques of deception. These distinctions are recognized in ordinary and commercial usage and they are preserved in the bond. Not all defaulting loans obtained upon the basis of fraud and deception are covered. In fact, the bond generally excludes from coverage losses resulting from default on loans, regardless of whether the loan was procured through trick, artifice, fraud or false pretenses; the limitation on this exclusion for loans fraudulently obtained through the use of counterfeit documents merely appears as an exception to the general exclusion. *There is a difference between extending credit on the basis of pledged counterfeit stock certificates, a risk clearly within the purview of the bond, and extending credit on the basis of invoices that cover non-existent shipments and that have been submitted as evidence of previously pledged accounts receivable. The bank could verify the existence of the pledged accounts receivable by inquiring with the loan applicant's purported customer, while detecting a counterfeit security is likely to pose significantly different and more serious risks to the bank.*

*American National Bank*, 431 F.2d at 922–23 (quoting *Exchange National Bank of Olean v. Insurance Co. of North America*, 341 F.2d 673, 676 (2nd Cir.1965) (emphasis in original and supplied), *cited in Maryland Casualty*, 425 F.2d at 983–84).

In contrast, the Eighth Circuit interpreted a similar bankers blanket bond to deny coverage for loss resulting from floor plan notes and chattel mortgages covering automobiles the signer did not own and possess. *See State Bank of Poplar Bluff v. Maryland Casualty Co.*, 289 F.2d 544 (8th Cir.

1961). Unlike this case, however, the plaintiff's theory of recovery in *State Bank of Poplar Bluff* was based on forgery, not counterfeiting. *Id.* at 546.

Here, the stock certificates were clearly imitations intended to deceive and be taken for originals. These same certificates did deceive another bank on two occasions as well as deceiving National City. The certificates imitated the original Panhandle certificates, including the forged signatures of the true names of Panhandle's corporate secretary and president. Clemens had access to original Panhandle certificates and imitated them so as to be taken for originals, which they were by two different banks.

The rule to apply in cases of fake stock certificates is that adopted by the Second, Fifth and Ninth Circuits as stated herein. Consequently, we hold the fake Panhandle stock certificates were counterfeit within the meaning of the bankers blanket bond. We reverse the trial court and remand for entry of judgment in favor of National City in the amount of $194,000 plus interest, and consideration of an award of attorney fees in that court to National City consistent with conclusion 17 of the trial court's December 18, 1987 order for judgment.

### 3. *Reasonable Expectation Doctrine*

■ The trial court found application of the reasonable expectation doctrine was not appropriate. We agree. "The doctrine of protecting the reasonable expectations of the insured is closely related to the doctrine of contracts of adhesion." *Atwater Creamery Co. v. Western National Mutual Insurance Co.*, 366 N.W.2d 271, 277 (Minn.1985).

In *Atwater*, the supreme court applied the doctrine to interpret insurance contract language applicable under a burglary loss claim to find coverage consistent with the objective reasonable expectations of the insured, even though the policy provisions negated those expectations. In doing so, the supreme court found no ambiguity in the policy, but found hidden major exclusions and unconscionability of the clause

due to unequal bargaining power and the insured's lack of insurance expertise.

Here, there is no hidden major exclusion. In fact, clause E is not an exclusion but an insuring clause. It cannot be said there is unconscionability due to unequal bargaining power when the parties are a major national bank and an insurance company. Nor is lack of insurance expertise a factor. The trial court did not err when it declined to apply the reasonable expectation doctrine.

### 4. *Jury Trial*

National City argues the trial court improperly denied it a jury trial. The trial court concluded that because the court accepted the stipulated facts and offers of proof, and because the only remaining questions are questions of equity, contract interpretation and law, National City was not entitled to a jury trial in any matter raised in the pleadings. In view of our favorable holding for National City, we find no prejudice even assuming error, and decline to reach this issue.

### DECISION

The trial court did not err when it held the actual physical possession clause of the bankers blanket bond did not bar recovery.

The trial court also did not err by refusing to apply the reasonable expectation doctrine. We decline to reach the jury trial issue finding no prejudice to National City.

We reverse the trial court's finding on counterfeit securities and hold the fake Panhandle stock certificates were counterfeit within the meaning of the bankers blanket bond and remand to the trial court for entry of judgment in favor of National City in the amount of $194,000 plus interest, and consideration of an award of attorney fees in that court to National City.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.