**FEDERAL DEPOSIT INSURANCE CORPORATION, as receiver for Neighborhood Community Bank, Plaintiff,**

v.

**The CINCINNATI INSURANCE COMPANIES, INC., Defendant.**

Civil Action No. 3:11–cv–145–TCB.

United States District Court, N.D. Georgia, Newnan Division.

Sept. 17, 2013.

Ashley Elizabeth Wilson, George P. Shingler, Joyce Gist Lewis, Shingler Lewis LLC, Atlanta, GA, for Plaintiff.

Fred C. Statum, III, Justin D. Wear, Sam H. Poteet, Jr., Manier & Herod, P.C., Nashville, TN, William Randal Bryant, Bovis, Kyle, Burch & Medlin, LLC, Atlanta, GA, for Defendant.

## ORDER

TIMOTHY C. BATTEN, SR., District Judge.

This case is before the Court on the parties' cross-motions for summary judgment. For the reasons below, the Court GRANTS Defendant's motion [60] and DENIES Plaintiff's motion [51].

## I. Background

### A. Factual Summary

Jeffrey Grant wanted to purchase and develop 2.6 million dollars' worth of real property from several sellers in Henry County, Georgia. But he did not want to put any of his own money into the project. He wanted a bank to lend him the entire $2.6 million and more money later for development. But no bank was likely to lend him one hundred percent of the purchase price. Indeed, Neighborhood Community Bank ("NCB"), represented as Plaintiff here by the FDIC, would only make the loan to Grant if he deposited $625,000 of his own money as collateral.

So Grant devised a scheme to get the loan and buy the property without putting up any of his own money. He entered into several legitimate sales contracts to buy parcels of property from multiple owners for a total purchase price of $2.6 million. But he also fabricated a single sales contract and forged one owner's signature. The forged sales contract stated that Grant was purchasing just one parcel from one owner for $3.36 million. He applied for a loan from NCB and presented the forged sales contract. Relying on the contract, NCB initially loaned Grant $3.4 million. He then purchased the parcels via the legitimate sales contracts for $2.6 million. He used the extra $800,000 of NCB's money to deposit the $625,000 NCB demanded as collateral. Grant got a loan, purchased the property, and deposited the required collateral without spending any of his own money.

Eventually the loan went bad. NCB, and later the FDIC as receiver, wanted its money back. Grant was judgment-proof. The FDIC recovered some of the loss in a legal malpractice settlement with NCB's closing attorney. It then sought further recovery from NCB's insurer under the forgery provision of a bank insurance bond. The insurer refused to pay, arguing the bond does not cover the loss. This action for breach of contract ensued.

### B. Statement of Facts

### 1. Loan Application and Approval

NCB was a state-chartered bank in Newnan, Georgia. On June 26, 2009, the FDIC was appointed as its receiver. The Cincinnati Insurance Companies and NCB entered into an insurance contract effective January 1, 2008. The insurance contract, known as a depository institutions blanket bond or, more commonly, a financial institution bond, insures against certain bank losses. The bond's relevant provisions are as follows:

- Insuring Agreement E covers loss by reason of forgery;

- Condition B limits coverage to losses discovered after the effective date of the bond; and

- Exclusion H excludes from coverage losses caused by an employee.

Each provision is discussed in detail below.

Jeffrey Grant owned and controlled a business entity called Orchard Road, LLC. In January 2006, Grant, on behalf of Or-

chard Road, applied for an acquisition and development loan from NCB. Michael Scott was the NCB loan officer responsible for the Orchard Road loan. The bank's directors loan committee had authority to approve the loan. Scott was not on this committee.

Grant gave Scott a signed sales contract describing the property purchase underlying his loan application. The sales contract was dated November 20, 2005, but contemplated a closing date of March 1, 2005, eight months earlier. The contract stated it was for the purchase of 76.6 acres, more or less, from Saralyn Heny for $3.36 million, and that the purchaser was Southern Lumber, Inc., a separate Grant-owned entity. The contract referred to an Exhibit A that purportedly described the property, but the contract contained no exhibits. NCB had the property appraised. The appraisal stated the property was 72.45 acres, approximately four acres fewer than stated in the sales contract.

Scott prepared a loan approval form for the directors loan committee. He included in the form information from the sales contract including the $3.36 million purchase price. The form stated the size of the property was 72.42 acres. The form stated the loan would include two forms of security: a deed to secure debt on the parcel purchased with the loan proceeds and a requirement that Grant deposit $625,960 with NCB as collateral. On February 1, 2006, the DLC approved the Orchard Road loan based on information from the sales contract in the loan approval form.

### 2. Loan Closing

The loan closed on February 27, 2006. NCB retained Mark Brittain as its closing attorney. At or before closing, NCB received a HUD settlement statement drafted and signed by Brittain. HUD settlement statements explain the details of loans made for the purchase of real estate. They memorialize who paid what to whom. They state how much money the lender loaned to the borrower, how much the borrower gave back as collateral, and how much the borrower paid to the seller for the underlying property.

The settlement statement drafted and signed by Brittain reflected a loan disbursement of $3.36 million from NCB to Grant. It stated that Grant gave NCB $625,960 of his own money as a collateral deposit, and that Grant paid $3.36 million for the property. The settlement statement contained blank boxes to be completed with the name, address and signature of the seller. Those boxes were left blank.

Most of the settlement statement's representations were false. Although he did obtain $3.36 million from NCB, Grant did not use $3.36 million to purchase the property; he used only $2.64 million. The difference of approximately $730,000 was disbursed to Southern Lumber, another Grant company that does not appear on the settlement statement. Grant used part of the $730,000 to make the required $625,960 collateral deposit with NCB.

NCB closed the loan despite several irregularities in the sales contract and the attendant documents, including: the sales contract was dated November 20, 2005, but stated the sale would close on or before March 1, 2005, more than eight months earlier; the sales contract referred to an Exhibit A describing the property but in fact contained no exhibits; the settlement statement was blank in several places, including the seller's name, address and signature; the sales contract contained an acreage figure of "76.6 acres, more or less," which differed from other loan documents, including the appraisal and the loan approval form, which each recited 72 acres,

and the settlement statement, which recited 73 acres; the sales contract identified the buyer as Southern Lumber, Inc., another Grant-owned entity, rather than Orchard Road, LLC; and the sales contract misspelled the seller's name as Saralyn "Heny" rather than Saralyn Henry.

### 3. After Closing

In April 2006, two months after the February closing, Brittain, NCB's closing attorney, sent to NCB a letter containing documents related to the Orchard Road loan. The documents included a copy of a deed to secure debt on the acquired property in NCB's favor. The deed to secure debt stated that it secured five separate land parcels, and not a single parcel as contemplated by the sales contract. The deed to secure debt reflected that surveys of the five tracts were prepared for an entity known as Mandalay Properties.

### 4. Default, Discovery and Denial

Two years after closing, the Orchard Road loan defaulted. NCB retained an attorney, Michael White, to pursue collection litigation against Grant. White met with Mark Brittain on September 25, 2008 to discuss the details of the Orchard Road closing.

The FDIC claims NCB discovered the loss on the Orchard Road loan at that September 25 meeting, eight months after the bond's effective date. It claims NCB learned at that meeting that Grant did not purchase one tract of land from one seller as contemplated by the sales contract and the loan terms. It claims NCB learned that Grant, through another entity known as Mandalay Properties, purchased multiple tracts of land from multiple sellers.

NCB initially suspected that Scott, the loan officer, was responsible for the loss. Scott attended the closing on behalf of

NCB. At the September 25 interview, Brittain accused Scott, claiming Scott approved the anomalous settlement statements and the disbursement of funds in conflict with the loan approval form. On October 21, 2008, based on its belief that Scott was responsible, NCB notified Cincinnati of a loss under the bond's employee fraud or dishonesty provision. The FDIC later determined that Scott had not approved the anomalous settlement statements or the disbursements and that Brittain had falsely accused Scott.

On August 13, 2009, the FDIC supplemented NCB's earlier notice to Cincinnati, this time explaining the loss was caused by Grant's forgery rather than Scott's dishonesty, and claiming coverage under the bond's forgery provision, Insuring Agreement E. On December 24, the FDIC submitted a sworn proof of loss to Cincinnati including an affidavit from Saralyn Henry, the seller identified on the forged sales contract. Henry stated she did not sign the $3.36 million sales contract, and that she owned only 63.74 acres, which she sold to Grant via one of the legitimate sales contracts for $2.23 million.

On March 25, 2011, Cincinnati denied the FDIC's claim for coverage under the insurance bond.

### 5. Legal Malpractice

While it pursued recovery from Cincinnati, the FDIC also filed a lawsuit against Mark Brittain. The suit alleged legal malpractice stemming from his conduct in closing the Orchard Road loan as well as three other loans NCB made to Grant.

In its legal malpractice complaint, the FDIC averred that Brittain "wrongfully prepared" two sets of HUD settlement statements.[1] He first prepared a set of

---

1. The FDIC contends that its complaint from its legal malpractice action against Brittain is

inadmissible here. It is mistaken. *See Muhs v. River Rats, Inc.,* 586 F.Supp.2d 1364, 1378

four settlement statements reflecting Grant's true purchases of multiple tracts for $2.6 million from multiple sellers. He then prepared a separate settlement statement reflecting a single, fictional $3.36 million purchase in accordance with the forged sales contract and NCB's loan terms, but not in accordance with reality. At closing he gave NCB only the falsified settlement statement. The FDIC further averred that Brittain's actions were "not authorized" and were "in breach of NCB's loan commitment and the instructions given to [him]." The FDIC averred that the Orchard Road loss was the "proximate result" of Brittain's conduct. The FDIC and Brittain settled the legal malpractice action in December 2011. The FDIC accepted payment of $1.8 million as settlement of claims related to the Orchard Road loan and two other Grant loans closed by Brittain.

After Cincinnati denied its claim under the insurance bond in March 2011, the FDIC filed this breach of contract action. It claims that Cincinnati breached the terms of the bond by refusing to insure the Orchard Road loan loss. The FDIC seeks compensatory damages, pre-judgment interest and attorneys' fees.

## II. Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). There is a "genuine" dispute as to a material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *FindWhat*

*Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir.2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In making this determination, however, "a court may not weigh conflicting evidence or make credibility determinations of its own." *Id.* Instead, the court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Id.*

"The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If the nonmoving party would have the burden of proof at trial, there are two ways for the moving party to satisfy this initial burden. *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437–38 (11th Cir.1991). The first is to produce "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.* at 1438 (citing *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548). The second is to show that "there is an absence of evidence to support the nonmoving party's case." *Id.* (quoting *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548).

If the moving party satisfies its burden by either method, the burden shifts to the nonmoving party to show that a genuine issue remains for trial. *Id.* At this point, the nonmoving party must "'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox,*

(S.D.Ga.2008) ("A party's pleading in one case may generally be used as an evidentiary admission in another litigation." (quoting McCormick on Evidence § 257 (6th ed. 2006))); *accord Williams v. Union Carbide*

*Corp.*, 790 F.2d 552, 556 (6th Cir.1986) ("Pleadings in a prior case may be used as evidentiary admissions.") (citing *Contractor Utility Sales v. Certain-teed Prods. Corp.*, 638 F.2d 1061, 1084 (7th Cir.1981)).

*Inc.,* 64 F.3d 590, 593–94 (11th Cir.1995) (quoting *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548).

## B. Applicable Substantive Law

■ The Court must first decide what substantive law applies to this case. Federal law governs suits brought by the FDIC. 12 U.S.C. § 1819(b)(2)(A). Federal law gives the Court an option: apply federal common law or the law of Georgia. *See FDIC v. Kan. Bankers Sur. Co.,* 963 F.2d 289, 293–94 (10th Cir.1992) (citing *FDIC v. Bank of S.F.,* 817 F.2d 1395, 1398 (9th Cir.1987)); *see also United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 728, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979).

Federal common law interpreting bank insurance bonds is scant. *See Kan. Bankers Sur. Co.,* 963 F.2d at 293–94. In such a case, courts presume state law is adequate. *Id.* (citing *FDIC v. Braemoor Assocs.,* 686 F.2d 550, 554 (7th Cir.1982)). Both parties have assumed Georgia law applies and is adequate, and the Court agrees. There is no reason to create federal common law. *See Resolution Trust Corp. v. Fid. & Deposit Co. of Md.,* 205 F.3d 615, 626 (3d Cir.2000) (applying state law where the FDIC sued as receiver to recover under a bank insurance bond). Accordingly, the Court will apply Georgia law.

## C. Analysis

### 1. Breach of Contract

To make out its breach of contract claim, the FDIC, as the insured, must prove that the Cincinnati bond covers the Orchard Road loan loss. *Matthews v. State Farm Fire & Cas. Co.,* 500 Fed.Appx. 836, 840–41 (11th Cir.2012) (per curiam) (quoting *Chix v. Ga. Farm Bureau Ins. Co.,* 150 Ga.App. 453, 258 S.E.2d 208, 209 (1979)). If the bond does not cover the loss, there can be no breach of contract.

The FDIC claims a covered loss only under Insuring Agreement E, which insures against forgery losses. To prove the bond covers the loss, the FDIC must make two showings: (1) that the loss is within the parameters of Insuring Agreement E; and (2) that NCB discovered the loss after the bond's effective date as required by Condition B. Even if it can make those two showings, Cincinnati can avoid liability by showing the bond's Exclusion H applies and excludes the loss from coverage.

The FDIC fails on each score. It cannot show Insuring Agreement E covers the loss; it cannot show NCB discovered the loss after the bond's effective date; and Cincinnati has shown Exclusion H applies to exclude the loss from coverage.

#### a. Insuring Agreement E

The FDIC bears the burden of showing Insuring Agreement E covers the loss. *See id.* To meet its burden, the FDIC must show each element of Insuring Agreement E is met. Those elements are: (1) the sales contract was a forgery; (2) NCB had actual, physical possession of the sales contract; (3) the loss was by reason of the forgery; and (4) NCB made the loan in good faith reliance on the sales contract. Each element is analyzed in turn below.

Ultimately the Court holds that the FDIC can show each element except the last. The sales contract was a forgery. NCB had actual, physical possession of the sales contract. The loss was by reason of the forgery. But NCB did not make the loan in good faith reliance on the forged sales contract. The FDIC's inability to show this final element is fatal to its claim.

#### i. Forgery

Insuring Agreement E only covers losses resulting from forgery. The bond defines forgery as "the signing of the name of another with intent to deceive; [forgery]

does not include the signing of one's own name with or without authority, in any capacity, for any purpose." The Court holds the sales contract was a forgery.

Grant's fabricated sales contract identified the property seller as Saralyn Heny. But Saralyn Henry, not Saralyn "Heny," had authority to sell the property. Cincinnati argues that because the sales contract identified the seller as Saralyn "Heny" rather than Saralyn Henry, the sales contract was not a forgery under the bond's definition. It argues that because Saralyn "Heny" does not exist, she is a fictitious person. A fictitious person is not "another natural person," and so signing her name was not "signing the name of another" under the bond's definition. The Court is not persuaded, for two reasons.

First, signing the name of a fictitious person is within the bond's definition of forgery. It is instructive to read the definition in its entirety. *See Sage Tech., Inc. v. NationsBank N.A. S.*, 235 Ga.App. 405, 509 S.E.2d 694, 696–97 (1998) ("[A] contract should be construed by examining the agreement in its entirety, and not merely by examining isolated clauses and provisions thereof." (internal quotations omitted)). The purpose of limiting the definition of forgeries to signing the "name of another" is to exclude signatures of *one's own name* without authority. The first phrase of the bond's definition— "[f]orgery means the signing of the name of another with intent to deceive"—is followed immediately by a second phrase for clarification: "[forgery] does not include the signing of one's own name with or without authority, in any capacity, for any purpose." The "name of another" language does not exclude signing fictitious names from the forgery definition. It excludes signing one's own name.

The Court holds that this definition of forgery unambiguously includes signing the name of a fictitious person. *Cf. Kenney v. Clark*, 120 Ga.App. 16, 169 S.E.2d 357, 358 (1969) ("[G]eneral and unlimited terms are restrained and limited by particular recitals, when used in connection with them." (quoting *McCann v. Glynn Lumber Co.*, 199 Ga. 669, 34 S.E.2d 839, 840 (1945))). Even if the forgery definition were ambiguous, Cincinnati's position would be untenable. Ambiguities in insurance contracts are construed strictly against the insurer. *See Am. Cas. Co. of Reading, Pa. v. Etowah Bank*, 288 F.3d 1282, 1285 (11th Cir.2002).[2] If the definition were ambiguous, the Court would construe it against Cincinnati and hold that it includes signatures of fictitious persons.

Second, even if the Court assumed for the sake of argument that the forgery definition excludes signatures of fictitious persons, Cincinnati's argument would fail. The signature of Saralyn "Heny" was not the signature of a fictitious person. It was the signature of a real person known to the parties, whose name was simply mis-

2. Cincinnati argues that this well-worn principle of contract interpretation does not apply to bank insurance bonds. It cites numerous cases apparently supporting its position, but ignores the one controlling case directly on point. In a case interpreting a similar bank insurance bond under Georgia law, the Eleventh Circuit held: "parties to an insurance bond are bound by its plain and unambiguous terms. However, if a term is ambiguous it must be construed against the insurer, as the drafter, and in favor of the insured." *Am. Cas. Co. of Reading, Pa. v. Etowah Bank*, 288 F.3d 1282, 1285 (11th Cir.2002) (citing *Richards v. Hanover Ins. Co.*, 250 Ga. 613, 299 S.E.2d 561, 563 (1983); *Ga. Farm Bureau Mut. Ins. Co. v. Huncke*, 240 Ga.App. 580, 524 S.E.2d 302, 303 (1999); *Ga. Baptist Children's Homes & Family Ministries v. Essex Ins. Co.*, 207 Ga.App. 346, 427 S.E.2d 798, 801 (1993)). Neither the Georgia appellate courts nor the Eleventh Circuit recognizes an exception to this general principle for bank insurance bonds.

spelled. Falsely signing her name, even with a one-letter misspelling, is a forgery.

Cincinnati cites one case in support of its argument that the signature was not a forgery because it was a fictitious person's. That case actually undermines Cincinnati's argument. In *French American Banking Corp. v. Flota Mercante Grancolombiana, S.A.*, 925 F.2d 603, 603 (2d Cir.1991) (per curiam), a bank claimed a forgery loss under an identical Insuring Agreement E. The court held the signatures at issue were not forgeries because they were "illegible," "did not represent the name of any person known to the parties," and could have been "by an unauthorized person signing in his own name, or simply scribbling no name." *Id.* at 604. *Flota* is distinguishable. *Flota* held that an indecipherable signature is not a forgery. It did not hold that the signature of a fictitious person is not a forgery. The "scribbl[e]" in *Flota* was barely a signature at all and bore no resemblance to a known person. The signature in this case is legible and bears a nearly identical resemblance to that of Saralyn Henry, a known person and the rightful seller, notwithstanding a one-letter typographical error.

The Court surmises that Grant simply misspelled Saralyn Henry's name on the forged sales contract by leaving out the letter "r." A misspelled forgery is still a forgery.

### ii. Actual physical possession

Insuring Agreement E covers losses only if the insured had "actual physical possession" of the forgery. The Court holds that NCB had actual physical possession of the forged sales contract.

Cincinnati argues that NCB did not have actual physical possession of the forged sales contract. It argues that because the directors loan committee—the internal body authorized to approve the Orchard Road loan—did not possess the sales contract, NCB did not satisfy the bond's possession requirement. Cincinnati concedes that Scott—the loan officer responsible for the Orchard Road loan—had possession of the sales contract, but argues his possession does not satisfy the requirement because he did not have authority to approve the loan. Only the DLC had such authority, and it did not possess the contract.

Cincinnati relies on *Highland Bank v. BancInsure, Inc.*, 2012 WL 3656523 (D.Minn. Aug. 24, 2012), to argue that the DLC itself must have possessed the forged sales contract. But *Highland Bank* is inapposite. The *Highland Bank* bond required possession of an "original" of the forged document, while no such requirement appears in Insuring Agreement E. *Id.* at *2. In *Highland Bank*, no bank employee with any role in the loan process claimed to have ever seen an original version of the forged document. The court sensibly held that the bank had not satisfied its bond's original possession requirement. *Id.* at *4.

 In contrast, the bond here does not require possession of an original document. Insuring Agreement E requires only "actual physical possession" of the forged document, whether an original or a copy. It is undisputed that Scott, a vice president and the loan officer responsible for the Orchard Road loan, had actual, physical possession of the forged sales contract. Scott summarized the information in the sales contract to create the loan approval form for the DLC. According to NCB's former CEO, the DLC approved the loan in reliance on Scott's summary of the sales contract and on the understanding that NCB, through Scott, possessed the sales contract. The bond does not require the DLC itself to have actual, physical possession of the sales contract. It only requires

possession by "the Insured ... or [its] authorized representative." Cincinnati does not and could not dispute that Scott, a vice president and the loan officer in charge of the Orchard Road loan, possessed the sales contract on behalf NCB or at least as NCB's authorized representative. *See Dix v. Shadeed,* 261 Ga.App. 145, 581 S.E.2d 747, 748 (2003) (holding an employee is an agent of his employer where the employer assumes the right to control time, manner, and method of work).

As long as an NCB employee with a role in the loan process had actual, physical possession of the forged sales contract, NCB met the possession requirement. Scott had actual, physical possession of the forged sales contract. His possession was sufficient to satisfy Insuring Agreement E's actual, physical possession requirement.

### iii. Loss "by reason of" forgery

Insuring Agreement E only covers losses incurred *"by reason of* the Insured ... extend[ing] any credit ... or otherwise act[ing] upon any ... document, or other written instrument which proves to have been a forgery ...."* (emphasis added). The Court holds the loss was by reason of the forgery.

The FDIC argues that the loss was "by reason of" the forgery simply because NCB extended credit on the basis of the forged sales contract. Cincinnati responds that the loss was by reason of the falsity of the sales contract, not the forgery. In Cincinnati's view, NCB would have incurred the loss even if the signature on the sales contract were genuine, because the collateral in the sales contract was nonexistent. Neither Saralyn "Heny" nor Saralyn Henry owned the 76.6 acres the contract purported to sell. Henry owned only 63.74 acres, which she sold to Grant via one of the legitimate sales contracts.

Therefore, Cincinnati argues, the loss was by reason of the absence of collateral, not by reason of the forgery.

In support of their positions, the parties principally cite two apparently conflicting cases. Cincinnati points to *Georgia Bank & Trust v. Cincinnati Insurance Co.,* 245 Ga.App. 687, 538 S.E.2d 764 (2000). In that case, two borrowers assigned their interest in a savings account as collateral for a loan. They forged documents showing the account had a positive balance. After they defaulted, the bank discovered the documents were forged and the savings account was empty. The bank sought recovery under an identical bank insurance bond. The insurer made a similar argument to the one made here: absence of collateral, not the forgery, caused the loss. Even if the forged signatures were genuine, it argued, the bank would have incurred a loss because the collateral—the money in the savings account—did not exist. The Georgia Court of Appeals agreed and held for the insurer.

The FDIC points to *First National Bank of Manitowoc v. Cincinnati Insurance Co.,* 485 F.3d 971 (7th Cir.2007). There, an auto dealership presented forged leases as collateral for a loan. Upon default, the bank discovered the forgery and learned the leases were fabricated. Again, the insurer made a similar argument: absence of collateral, not the forgery, caused the bank's loss. The *Manitowoc* court was unmoved. It held that such an argument "ignores the plain language of Insuring Agreement E." *Id.* at 979. It held the bond covered the bank's loss because the bank's activity fit within a plain reading of Insuring Agreement E: it "extended credit to [the debtor] based on vehicle leases which proved to be forgeries." *Id.*

Cincinnati would have the Court follow *Georgia Bank;* the FDIC would have it follow *Manitowoc.* All else being equal, the Court must follow the Georgia courts' interpretations of Georgia law. *See Silverberg v. Paine, Webber, Jackson & Curtis, Inc.,* 710 F.2d 678, 690 (11th Cir.1983); *see also CSX Transp., Inc. v. Trism Specialized Carriers, Inc.,* 182 F.3d 788, 790 (11th Cir.1999) (following the Georgia Court of Appeals where, as here, the Georgia Supreme Court has not declared the relevant state law).

But all else is not equal. After a close review of the *Georgia Bank* opinion, the Court holds *Georgia Bank* does not interpret Insuring Agreement E. It interprets only Insuring Agreement D, which has a stricter standard of loss causation. Its holding is inapplicable here, where only Insuring Agreement E is at issue. *Cf. State Farm Mut. Auto. Ins. Co. v. Duckworth,* 648 F.3d 1216, 1224 (11th Cir.2011) (holding federal courts should follow state court decisions that are "based on facts essentially indistinguishable from the facts at hand"). Only *Manitowoc* interpreted Insuring Agreement E. The Court adopts its reasoning.

■ Although *Georgia Bank* refers in passing in a footnote to both Insuring Agreements D and E, its main text explicitly states that the bank claimed its loss was "covered under the specific provisions of the [bond] insuring loss *resulting directly from* forgery...." *Georgia Bank,* 538 S.E.2d at 765 (emphasis added). Only Insuring Agreement D contains such "resulting directly from" language. *See id.* at 765 n. 3. Insuring Agreement E, both in *Georgia Bank* and here, covers loss "by reason of" forgery. *Id.* The bank in *Georgia Bank* was claiming a loss only under Insuring Agreement D, not Insuring Agreement E. The Court concludes *Georgia Bank* interprets only Insuring Agreement

D. This conclusion is bolstered by examination of the cases cited in *Georgia Bank.* None interpreted "by reason of" language. *See Republic Nat'l Bank of Miami v. Fid. & Deposit Co. of Md.,* 894 F.2d 1255, 1262 (11th Cir.1990) (interpreting a variation of Insuring Agreement E covering loss "resulting directly from" forgery); *KW Bancshares, Inc. v. Syndicates of Underwriters at Lloyds,* 965 F.Supp. 1047, 1049 (W.D.Tenn.1997) (same); *Liberty Nat'l Bank v. Aetna Life & Cas. Co.,* 568 F.Supp. 860, 865 (D.N.J.1983) (interpreting Insuring Agreement D).

*Georgia Bank's* holding applies only to insuring agreements with "loss resulting directly from" language. Insuring Agreement E has no such language. *Georgia Bank* is inapplicable here. It interprets Insuring Agreement D, which has a "direct[ ]" standard of causation. Insuring Agreement D is materially different from Insuring Agreement E. The former covers loss "resulting directly from" forgery, whereas the latter covers loss "by reason of" forgery. Insuring Agreement D's "resulting directly from" language naturally implies a stricter standard of causation than Insuring Agreement E's "loss by reason of" language. *See Flagstar Bank, F.S.B. v. Fed. Ins. Co.,* 260 Fed.Appx. 820, 824 (6th Cir.2008) (explaining that Insuring Agreement D's "resulting directly from" requirement creates a "heightened causation standard" as compared to Insuring Agreement E's "by reason of" language, which is a "less stringent causation standard").

The *Georgia Bank* reasoning—that a loss is covered only if *directly* caused by the forgery itself, rather than the absence of underlying collateral—is sensible only under Insuring Agreement D's "resulting *directly* from" requirement. It is not sensible under Insuring Agreement E's less strict "by reason of" requirement, where

the word "directly" does not appear. *See Merchs. Bank & Trust Co. v. Cincinnati Ins. Co.*, 2008 WL 728332, at *4 (S.D.Ohio March 14, 2008) ("Unlike Insuring Agreement D, there is no requirement [in Insuring Agreement E] that the loss be *directly attributed* to the forgery." (emphasis added)).

The Court, still mindful of Georgia law requiring construction of ambiguities against Cincinnati, holds Insuring Agreement E covers losses incurred when a bank extends credit on the basis of forged documents, notwithstanding the absence of underlying collateral. *See ALEA London Ltd. v. Woodcock*, 286 Ga.App. 572, 649 S.E.2d 740, 745 (2007) (holding ambiguities are strictly construed against the insurer as drafter) (quoting *Guar. Nat'l Ins. Co. v. Brock*, 222 Ga.App. 294, 474 S.E.2d 46, 49 (1996)).

█ The Court's holding is also in accordance with two other Georgia principles of contract interpretation. First, Georgia law requires courts to interpret contracts to avoid rendering any terms meaningless. *VATACS Grp., Inc. v. HomeSide Lending, Inc.*, 276 Ga.App. 386, 623 S.E.2d 534, 538 (2005) (citing *Vaughn, Coltrane & Assocs. v. Van Horn Constr.*, 254 Ga.App. 693, 563 S.E.2d 548, 550 (2002)). If the Court interpreted Insuring Agreement E's "by reason of" standard identically to Insuring Agreement D's "resulting directly from" standard, the term "directly" in the latter would be rendered meaningless.

█ Second, Georgia law requires courts to interpret contract terms according to their ordinary meaning. *See Imaging Sys. Int'l, Inc. v. Magnetic Resonance Plus, Inc.*, 241 Ga.App. 762, 527 S.E.2d 609, 610–11 (2000) (quoting *Wickliffe v. Wickliffe Co.*, 227 Ga.App. 432, 489 S.E.2d 153, 156 (1997)). Insuring Agreement E covers losses incurred "by reason of . . . extending any credit . . . or otherwise

act[ing] upon any . . . document, or other written instrument which proves to have been a forgery. . . ." The loss fits under an ordinary understanding of those terms. NCB incurred a loss by reason of extending credit based on a forged document. Whether part or all of the loss was caused by the absence of underlying collateral is beside the point.

The loss was by reason of the forgery. The loss need not be "directly" caused by the forgery; it need only be "by reason of" of the forgery. It was. *See Manitowoc*, 485 F.3d at 980 (holding a bank's extension of credit based on forged lease documents "easily fit[s] within [Insuring Agreement E's] coverage language").

### iv. Good faith

Insuring Agreement E only covers losses resulting from the insured "having in *good faith* and in the usual course of business . . . extended any credit . . . or otherwise acted upon any . . . document, or other written instrument which proves to have been a forgery. . . ."

█ The Court holds that NCB's extension of credit based on the forged sales contract was not in good faith. NCB ignored numerous facial irregularities on the forged sales contract and attendant loan documents. Its ignorance amounted to gross negligence and a knowing indifference to red flags that should have alerted it to the presence of forgery. Its gross negligence and knowing indifference breached the good faith requirement.

Cincinnati argues that NCB did not make the loan in good faith because it ignored numerous "red flags" in the forged sales contract and other attendant documents related to the Orchard Road loan. Cincinnati identifies the following red flags:

- The forged sales contract was dated November 20, 2005, but recited its closing date as March 1, 2005, nearly eight months prior to the contract date;

- The forged sales contract referred to an Exhibit A describing the property, but no exhibits were attached;[3]

- The HUD settlement statement contained blank spaces for the seller's name, address and signature, and each space was left blank so as to identify no seller at all;

- The forged sales contract's acreage figure ("76.6 acres, more or less") conflicted with acreage figures on the loan approval form (72.42 acres), the appraisal (72.45 acres), and the settlement statement (73.21 acres);

- The forged sales contract identified the buyer as Southern Lumber, Inc., rather than the debtor, Orchard Road, LLC; and

- The forged sales contract misspelled the name of the seller as Saralyn "Heny" rather than Saralyn Henry.

The FDIC argues that making the loan despite these red flags was not bad faith.

The bond does not define good faith. There is only one line of cases from a controlling jurisdiction interpreting Insuring Agreement E's good faith requirement. The Fifth Circuit held in 1969 that an insured's ordinary negligence alone does not necessarily vitiate good faith. *First Nat'l Bank of Fort Walton Beach v. U.S. Fid. & Guar. Co.*, 416 F.2d 52, 57 (5th Cir.1969) ("Ordinary negligence, without more, does not convert good faith into bad."). The Eleventh Circuit adopted this reasoning in *Beach Community Bank v. St. Paul Mercury Insurance Co.*, 635 F.3d 1190, 1200 (11th Cir.2011). It explained that "the requirement of good faith in the forgery provision of a financial institution bond does not bar recovery under Florida law when the insured failed to verify the legitimacy of [a forged signature on] financial statements because '[o]rdinary negligence, without more, does not convert good faith into bad.'" *Id.* (quoting *Fort Walton*, 416 F.2d at 57). Later cases from other jurisdictions agree. The good faith requirement is usually satisfied if the insured acts honestly and without knowledge of the forgery. *First Nat'l Bank of Manitowoc v. Cincinnati Ins. Co. (Manitowoc II)*, 485 F.3d 971, 978 (7th Cir.2007); *First Nat'l Bank in Manitowoc v. Cincinnati Ins. Co. (Manitowoc I)*, 2005 WL 2460719, at *3 (E.D.Wis. Oct. 5, 2005) ("Good faith

---

**3.** The FDIC claims there is a factual dispute as to whether the forged sales contract contained an Exhibit A. It argues that Cincinnati "has not obtained any testimony stating that the [sales contract] did not have an exhibit [A] attached when it was provided to NCB by the borrower." That is true. But Cincinnati has pointed to numerous exhibits in the record containing copies of the forged sales contract. Each refers to an Exhibit A. None contains one. The FDIC has offered no evidence that the sales contract did in fact have an Exhibit A attached.

The FDIC bears the burden of showing that NCB acted in good faith; it is an element of its breach of contract claim. *See Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1199 (11th Cir.2010) (citing *Cont'l Assurance Co. v. Rot-*

*hell*, 227 Ga. 258, 181 S.E.2d 283, 285 (1971)). When the nonmoving party—the FDIC—bears the burden of proof on an issue, the moving party—Cincinnati—can obtain summary judgment by "'showing ... that there is an absence of evidence to support the nonmoving party's case.'" *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437–38 (11th Cir.1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Cincinnati has made such a showing as to the absence of Exhibit A. The FDIC has provided no contradictory evidence that the sales contract in fact contained an Exhibit A. There is no genuine factual dispute. No reasonable jury could find from the evidence in the record that the sales contract contained an Exhibit A.

... is largely synonymous with arm's length and honesty."). The Court adopts this rule, as it must. Ordinary negligence alone does not vitiate good faith.

■ However, an insured's conduct can vitiate good faith even without subjective dishonesty, actual knowledge of, or complicity in the forgery. If an insured's conduct rises past ordinary negligence to the level of gross negligence or knowing indifference to "red flags," it breaches the good faith requirement. *See Marsh Inv. Corp. v. Langford,* 721 F.2d 1011, 1014 (5th Cir. 1983) ("[M]ere ignorance is not bad faith, but ... if one chooses to remain ignorant ... in fear of what a little knowledge will disclose ... such selective ignorance is bad faith." (internal quotation omitted)); *see also Manitowoc II,* 485 F.3d at 978 n. 5 (suggesting that "extend[ing] credit based on documents that look[ ] suspicious" would be bad faith); *Manitowoc I,* 2005 WL 2460719, at *5 ("To the extent an insured's negligence rose to the level of gross negligence or knowing indifference to red flags raised about a document or customer, the bond's good faith requirement would preclude coverage."); *cf. Stix Friedman & Co. v. Fid. & Deposit Co. of Md.,* 563 S.W.2d 517, 521 (Mo.Ct.App.1978) (approving a jury instruction stating, " 'good faith' means freedom from knowledge of circumstances which *ought to* put a person on inquiry" (emphasis added)).

Cincinnati argues that by making the loan despite numerous red flags, NCB acted with gross negligence or knowing indifference amounting to bad faith. The Court agrees. NCB's conduct in relying on the forged sales contract despite a "veritable sea of red flags" was gross negligence and knowing indifference to irregularities sufficient to warn NCB that the sales contract was forged. *Marsh,* 721 F.2d at 1014.

The FDIC responds by citing to several cases holding that mere negligence by the insured does not breach the good faith requirement. Each is distinguishable. The argument for bad faith in each was that the insured failed to properly or fully investigate a forged document. But in each case the forged document itself gave no indication that it was forged. The forged document appeared legitimate on its face and was not inherently suspicious. That is, there was no reason for the insured to suspect forgery. The courts in each case held that simply failing to investigate documents that appear legitimate is mere negligence and not bad faith.

Here, by contrast, NCB had ample information to suspect and discover the forgery without any investigation. The documents were not facially legitimate and were inherently suspicious. NCB did not act in bad faith because it failed to investigate; NCB acted in bad faith because it ignored numerous facial irregularities. No investigation was required to discover the forgery. The red flags Cincinnati identifies were on the face of the forged document itself and on the attendant loan documents. NCB had enough information from the documents themselves—without further investigation—to discover the forgery. NCB ignored or purposefully disregarded those red flags. Such conduct goes beyond mere failure to investigate. It is bad faith.

In the first case cited by the FDIC, *First National Bank of Fort Walton Beach v. U.S. Fidelity & Guaranty Co.,* 416 F.2d 52, 57 (5th Cir.1969), the court that held a bank's failure to "investigate the authenticity" of forged collateral documents did not amount to bad faith. The district court explained that there was "no apparent reason to doubt the veracity" of the documents. *First Nat'l Bank of Fort Walton Beach v. U.S. Fid. & Guar. Co.,*

274 F.Supp. 305, 306 (N.D.Fla.1967) (motion to dismiss); *see also Beach Cmty. Bank v. St. Paul Mercury Ins. Co.,* 635 F.3d 1190, 1200 (11th Cir.2011) (citing *Fort Walton* for the proposition that simply making "no effort to verify the authenticity" of documents that appeared legitimate is ordinary negligence and not bad faith). The *Fort Walton* bank's failure to investigate apparently truthful documents is qualitatively different from NCB's conduct here. NCB made the loan to Grant in spite of documents that, on their face, appeared untruthful.

Likewise, in *Manitowoc II,* 485 F.3d at 978 n. 5, a case upon which the FDIC heavily relies, the Seventh Circuit found good faith where the bank merely failed to investigate documents that "appeared legitimate." *Id.* The court contrasted its facts with a hypothetical situation in which bad faith would be present if a bank "extended credit based on documents that looked suspicious." *Id.* That hypothetical bad faith situation perfectly describes the facts here and makes *Manitowoc II* distinguishable. NCB extended credit based on documents that looked suspicious.

The lower court in *Manitowoc I,* which also found good faith, based its holding on the absence of "red flags ... that would tip the bank off that the [documents] were either forged or counterfeit." *Manitowoc I,* 2005 WL 2460719, at *4. In contrast, the forged sales contract and attendant documents here contained facial red flags that should have tipped NCB off to a forgery.

Finally, in the most recent Eleventh Circuit opinion analyzing the good faith issue, the court found no bad faith where a bank made a loan in reliance on a guaranty from a borrower and his wife. *Beach Cmty. Bank v. St. Paul Mercury Ins. Co.,* 635 F.3d 1190, 1192 (11th Cir.2011). The husband forged his wife's signature on the guaranty, but the document appeared legitimate and bore no signs of forgery. *See id.;* Order Granting Summ. J. at 1–2, *Beach Cmty. Bank v. St. Paul Mercury Ins. Co.,* No. 5:09–cv–106–RS–MD (N.D.Fla. Feb. 26, 2010), ECF No. 65. The Eleventh Circuit found good faith where the bank's only misdeed was making "no effort to verify the authenticity of the signature." *Beach Cmty.,* 635 F.3d at 1200. Again, in contrast, the sales contract and attendant documents here suffered from irregularities beyond a simple forged signature. Those irregularities should have put NCB on notice that the document was forged. NCB ignored facial irregularities that made the forged document suspicious. Its misdeed was more than simply failing to investigate documents that appeared legitimate.

The only cited case involving facts similar to those here, *Marsh Investment Corp. v. Langford,* 721 F.2d 1011 (5th Cir.1983), found bad faith. There, a borrower obtained a loan on the basis of a forged mortgage of corporate property. The bank knew the debtor was not a director, officer, or shareholder of the corporation that owned the mortgaged property. But the bank accepted the mortgage as security on the faith of a legal opinion letter specifically disclaiming any opinion as to whether the mortgage was legitimate. The court found bad faith. It held that the bank acted in bad faith by making the loan despite the fully disclaimed legal opinion and other red flags surrounding the transaction and the debtor. The court reasoned that the bank acted in bad faith by making the loan despite facial red flags that should have warned it of a fraud.

The facts of this case, although not squarely on all fours with any cited cases, are closer those of *Marsh* than to those of *Fort Walton, Manitowoc* or *Beach Community.* NCB did not merely fail to investigate apparently legitimate documents, as

in *Fort Walton, Manitowoc* and *Beach Community*. It ignored facial irregularities in the forged sales contract and attendant documents. The forged sales contract stated a closing date nearly eight months before the contract date. The forged sales contract referred to an exhibit describing the property to be sold but contained no such exhibit. The settlement statement failed to identify a seller and was left blank in several important places, including the name, address and signature of the seller. The acreage figures on the forged sales contract and the loan documents conflicted; no two documents stated the same acreage. The forged sales contract identified the buyer as a separate entity from the borrower to whom the loan was made. The forged sales contract misspelled the seller's name.

All those red flags were sufficient to warn NCB that the sales contract was forged. The red flags on the forged sales contract and the loan documents speak for themselves. Each would alert an observer that something was amiss. As for the settlement statement, FDIC's Rule 30(b)(6) designee testified that it is unusual for a settlement statement to omit the seller's name, address and signature. Robert Duckwall, a loan officer at NCB, testified that he would not close a loan if the name, address and signature of the seller were left blank on the settlement statement. He also testified that he would not close a loan in such circumstances because he could not trust the accuracy of the figures on an incomplete and unsigned settlement statement. NCB should not have trusted the numbers on a materially incomplete and unsigned settlement statement, and it should not have trusted a sales contract riddled with irregularities.

There is no dispute that the irregularities identified by Cincinnati existed at closing. The irregularities on the forged sales contract, the settlement statements, and other loan documents—without further investigation—should have alerted NCB to the forgery.

By making the Orchard Road loan despite these irregularities, NCB acted in bad faith. Insuring Agreement E does not cover a loss incurred in bad faith. Because Insuring Agreement E does not cover the loss, Cincinnati did not breach the insurance contract by denying the FDIC's claim. Cincinnati is entitled to judgment as a matter of law.

### b. Timely Discovery

■ The bond's discovery provision gives an alternative ground for judgment in Cincinnati's favor. Condition B limits coverage to losses discovered after the bond's effective date of January 1, 2008. Discovery occurs "when the Insured becomes aware of facts which would cause a reasonable person to assume that a loss covered by the bond has been or will be incurred, even though the exact amount of details or loss may not then be known." The bond defines discovery objectively. Discovery occurs when the insured learns facts that would cause a "reasonable person" to assume a bondable loss. Actual knowledge of a loss by the insured is not necessary for discovery under the bond's definition.

The parties dispute whether NCB discovered the loss after the bond's effective date of January 1, 2008. The FDIC claims that NCB discovered the loss on September 25, 2008, well after the bond's effective date. Cincinnati counters that NCB discovered the loss on one of three earlier dates, each predating the bond's effective date. The Court holds that NCB discovered the loss at least as early as April 2006. NCB's discovery before the bond's effective date precludes coverage.

The FDIC claims that NCB discovered the loss on September 25, 2008. That day, Michael White, NCB's attorney retained to pursue collection litigation against Grant, interviewed Mark Brittain, NCB's closing attorney. White learned in that interview that Grant used the Orchard Road loan proceeds to purchase multiple tracts of land from multiple sellers, rather than a single tract from a single seller as contemplated by the forged sales contract and the loan terms. The FDIC claims that this was the fact that led to discovery of the loss. The FDIC argues repeatedly that White's deposition testimony about his discovery on September 25, 2008 is the only admissible evidence showing when NCB discovered the loss. That is not so. White's testimony may be the only admissible evidence showing when White discovered the loss, but it does not necessarily show that *no one else* at NCB discovered the loss at an earlier date. As the Court holds below, other evidence shows that NCB in fact discovered the loss in April 2006.

Cincinnati first argues that NCB discovered the loss in February 2007 when it learned that Grant was struggling to develop the Orchard Road property and the loan was in or near default. This argument is meritless.

NCB could only discover the loss when it learned facts that would lead a reasonable person to assume a *bondable* loss had occurred or would occur. Default is not a bondable loss. The bond's Exclusion E, otherwise irrelevant to this case, limits coverage for loan losses to three specific causes. Loan losses—like the loss on the Orchard Road loan—are bondable only if caused by employee dishonesty (under Insuring Agreement A) or forgery, counterfeit or alteration (under Insuring Agreements D or E). Default is not a bondable loan loss. As Cincinnati correctly argues

elsewhere in its briefs, the bond is not credit insurance. It does not insure against losses from default. Accordingly, default could constitute discovery only if, like any other fact, knowledge of it should have put NCB on notice of a *bondable* loss—one caused by employee dishonesty or forgery, counterfeit or alteration. The record contains no evidence that the default should have put NCB on notice of employee dishonesty or forgery, counterfeit or alteration. Realizing the loan was in or near default was not discovery. NCB did not discover the loss in February 2007.

Second, Cincinnati argues that NCB discovered the loss at closing. It claims Brittain knew about the forgery at closing and his knowledge was imputed to NCB. Both parties agree that if Brittain was complicit in the forgery, any alleged knowledge of the forgery could not be imputed to NCB under agency principles. *See Witcher v. JSD Props., LLC,* 286 Ga. 717, 690 S.E.2d 855, 857–58 (2010) (holding that where an agent is guilty of independent fraud for his benefit, knowledge of the fraud is not imputed to the principal) (quoting *Hodgson v. Hart,* 165 Ga. 882, 142 S.E. 267, 269 (1928)). But neither party presents evidence showing whether Brittain was complicit. Both parties make conclusory statements that Brittain either was not complicit so his knowledge could be imputed (Cincinnati), or was complicit so his knowledge could not be imputed (the FDIC). Neither party meets the requirement for summary judgment. A genuine dispute of material fact exists as to whether Brittain was complicit in the forgery. The question would be one for a jury. But the question is irrelevant. The Court holds below that discovery occurred in April 2006. Whether discovery occurred in February or April 2006 is immaterial. Discovery on either date predates the

bond's effective period and precludes coverage.

Third and finally, Cincinnati argues that NCB discovered the loss in April 2006. At that time, NCB learned that Grant made purchases substantially different from the purchase described in the sales contract and the loan terms. Cincinnati argues this constituted discovery. The Court agrees.

These facts are undisputed: in April 2006, Brittain sent to NCB a letter containing documents related to the Orchard Road loan closing. The documents included a copy of the deed to secure debt securing the Orchard Road loan. The deed to secure debt showed the secured property consisted of five parcels rather than one. It also showed a survey of the five parcels was prepared for a "Mandalay Properties," not Orchard Road, LLC, Southern Lumber, Inc., or any other Grant entity.

The crux of Cincinnati's argument is as follows: the forged sales contract upon which NCB relied to make the loan was for the purchase of one tract. When NCB learned Grant actually purchased five tracts, it learned a fact that would cause a reasonable person to suspect forgery or other fraud and to assume a bondable loss would follow. Under the bond, that amounts to discovery. The Court agrees.

In support of its argument, Cincinnati points to the FDIC's own testimony and averments as to what fact gave rise to NCB's discovery of the loss. The FDIC's Rule 30(b)(6) designee was asked what specific fact led to NCB's discovery. He testified that discovery occurred on September 25, 2008 when Michael White, the NCB collection attorney, learned that Grant's purchase "consisted of more than one tract." The FDIC similarly averred in its legal malpractice complaint against Brittain that NCB discovered the loss on September 25, 2008, when it learned that Grant's purchase was not of one tract from

one seller but was of "five separate parcels" via contracts between "four different sellers and an entity known as Mandalay Properties."

Cincinnati agrees that NCB discovered the loss when it learned Grant purchased multiple properties. But Cincinnati argues that NCB learned that fact long before September 25, 2008. According to Cincinnati, NCB learned Grant purchased multiple properties in April 2006 when Brittain sent the documents referring to five tracts and not one.

The FDIC responds to this argument by claiming the fact which gave rise to NCB's discovery was that Grant's purchase was from several *sellers*, not merely that he purchased several *tracts*. The FDIC is correct that documents from Brittain did not explicitly state that Grant's purchase was from several *sellers*, only that it was of several *tracts*. According to the FDIC, the forged sales contract did not make any "representation as to the number of tracts to be conveyed"; it only "represent[ed] that there would be a single seller...." The FDIC argues that the documents from Brittain did not contradict the forged sales contract because the forged sales contract could have been for several tracts from one seller. Without a contradiction between the April 2006 documents and the forged sales contract, the FDIC argues, there was no discovery at the time NCB received Brittain's letter and documents in April 2006.

Cincinnati has the better argument. The Court notes that, contrary to the FDIC's assertions, the sales contract does in fact represent the sale of a single *tract* as well as sale by a single *seller*. *See* Compl. at Exh. A to Exh. D ("The undersigned Purchaser agrees to buy and the undersigned Seller agrees to sell all that *tract* [singular] or *parcel* [singular] of land

containing 76.6 acres, more or less, lying in land lots 187 of the 12th Land District of Henry County, Georgia." (emphasis added)). The documents sent by Brittain, referring to five tracts, conflict with the forged sales contract, which specifically refers to a single "tract." This conflict would lead a reasonable person to assume a bondable loss had occurred or would occur.

The FDIC makes a secondary argument that the fact leading to its discovery was that Grant's property purchases were actually made by an entity known as "Mandalay Properties," rather than the borrower, Orchard Road, LLC. The Court is not persuaded. The very same documents sent by Brittain in April 2006, state that the surveys of Grant's five tracts were prepared for a "Mandalay Properties," not for Grant, Orchard Road, LLC, Southern Lumber, Inc., Saralyn Henry, NCB, or any other party to the loan. NCB learned that "Mandalay Properties" was the true purchaser in April 2006.

NCB received documents from its own closing attorney in April 2006, just two months after closing. Those documents indicated the transaction did not conform to the terms of loan or the sales contract upon which NCB principally relied in making the loan. The receipt of such information would cause a reasonable person to question the authenticity of the sales contract and assume a loss from forgery or other bondable fraud would occur. *See Royal Trust Bank, N.A. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 788 F.2d 719, 720–21 (11th Cir.1986) (holding under an identical bond provision that discovery occurred after "negligence or inattention on the part of the bank" in failing to pay attention to records that would have alerted the bank to fraud).

When it received documents fundamentally contradicting the loan terms and the sales contract on which it relied to make the loan, NCB discovered the loss. Because its discovery occurred before the bond's effective date of January 1, 2008, the bond does not cover the loss.

### c. Exclusion H

The bond contains several exclusions from coverage. Only Exclusion H is relevant here. It excludes any "loss caused by an Employee. . . ." If Cincinnati shows that Exclusion H applies, the FDIC's breach of contract claim must fail. Although the Court has already held that Insuring Agreement E does not cover the loss and that NCB's untimely discovery precludes coverage, Exclusion H provides another alternative ground for judgment in Cincinnati's favor. Cincinnati argues that Brittain, the closing attorney, caused the loss. The Court agrees and holds that Exclusion H applies to exclude the loss from coverage.

 Cincinnati, as the insurer, bears the burden of showing that Exclusion H applies. *See York Ins. Co. v. Williams Seafood of Albany, Inc.*, 223 F.3d 1253, 1255 (11th Cir.2000) (citing *Nationwide Mut. Fire Ins. Co. v. Rhee*, 160 Ga.App. 468, 287 S.E.2d 257, 260 (1981)). There is no dispute that Brittain was an employee of NCB, as required for Exclusion H to apply. The only dispute is whether Brittain caused the loss. The bond does not define the term "caused." The parties have fought strenuously over its definition. Cincinnati argues for a low standard of causation to expand Exclusion H; the FDIC argues for a high standard of causation to restrict it. According to Cincinnati, Exclusion H applies even if an employee's conduct is not the sole or proximate cause of loss and even if the employee does not act negligently. According to the FDIC, Exclusion H only applies if an employee knowingly participates in the forgery.

Cincinnati is correct that employee conduct need not be the sole cause of loss to invoke Exclusion H. The exclusion's language does not contain such a requirement. *Peoples Bank of the S. v. BancInsure, Inc.*, 753 F.Supp.2d 649, 654 (S.D.Miss.2010) (" 'There is no support in the bond language for the theory that [employee conduct] must be the *only* cause of the loss' for exclusion (h) to apply." (quoting *Empire Bank v. Fid. & Deposit Co. of Md.*, 27 F.3d 333, 336 (8th Cir.1994))).

But the Court rejects Cincinnati's contention that employee conduct need not be related to the loss to invoke Exclusion H. Under such a rule, an insurer could deny coverage for any employee conduct leading to a loss, no matter how remotely connected to the loss that conduct might be. The security guard who opens the bank's door for the forger "caused" the loss, because the forger could not have deposited the forged check had he not been let inside. The owner of the bank also "caused" the loss because without him the bank would not exist. Obviously, the employee's conduct must bear some reasonable relationship to the loss, although it need not be the sole cause. *See First Nat'l Bank of Manitowoc v. Cincinnati Ins. Co.*, 485 F.3d 971, 981 (7th Cir.2007) (rejecting a similar interpretation of Exclusion H because it "would eliminate coverage under Insuring Agreements D and E in all cases, as bank employees are intermediaries in every forgery-related bank loss").[4]

Regardless, Brittain's conduct was related to the loss under any standard. He was intimately involved with the closing of the Orchard Road loan. *See Empire Bank*, 27 F.3d at 336 (declining to decide whether Exclusion H requires proximate cause because the employee conduct at issue would have met any standard of causation).

The question for the Court in defining "caused" is whether the employee must act with culpability. Cincinnati would have Exclusion H apply to any and all employee conduct in the vein of strict liability. The FDIC would have it apply only where an employee knowingly participates in the forgery. The law lies somewhere in between.

Courts have struggled with this question in this exact circumstance and have reached varied answers. *See* FINANCIAL INSTITUTION BONDS 477–83 (Duncan L. Clore ed., 3d ed. 2008) ("[D]ifficulty has been experienced in determining the reach of the [employee cause] exclusion where it is the insurer that is advocating employee causation to invoke the exclusion, particularly in forgery cases."). No controlling case law sets out the level of culpability (if any) necessary to invoke Exclusion H. Neither the Eleventh Circuit nor the Georgia appellate courts have addressed the question. The FDIC contends that Eleventh Circuit authority dictates that negligence alone does not invoke Exclusion H. But the cases to which the FDIC cites only hold generally that negligence does not pre-

---

**4.** The Court is mindful of the Eleventh Circuit's instruction that "tort-causation concepts like proximate cause ... are inappropriate for interpreting a financial institution bond, which is instead governed by contract law." *Beach Cmty. Bank v. St. Paul Mercury Ins. Co.*, 635 F.3d 1190, 1195 (11th Cir.2011) (internal quotation omitted). The Court's holding here is not applying tort concepts, but instead is applying the "cardinal rule" of Georgia contract construction: "ascertain[ing] the intention of the parties." O.C.G.A. § 13–2–3. The Court holds the parties could not possibly have intended "loss caused by an employee" to include all employee conduct tangentially connected to the loss, no matter how remotely. Such an intention would totally eliminate coverage and render the contract useless.

clude coverage under various insuring agreements in bank insurance bonds. None interprets Exclusion H or any provision with similar, general "caused by an Employee" language. *See Dixie Nat'l Bank of Dade Cnty. v. Emp'rs Commercial Union Ins. Co. of Am.*, 759 F.2d 826, 828 (11th Cir.1985) (interpreting a provision insuring against embezzlement and employee fraud in the subrogation context); *First Nat'l Bank of Fort Walton Beach v. U.S. Fid. & Guar. Co.*, 416 F.2d 52, 57 (5th Cir.1969) (interpreting a provision requiring the bank act "in good faith and in the usual course of business"); *Eglin Nat'l Bank v. Home Indem. Co.*, 583 F.2d 1281, 1285 (5th Cir.1978) (interpreting a provision insuring against "dishonest or fraudulent acts" by employees). These cases are inapposite.

Courts outside the Eleventh Circuit have interpreted Exclusion H's "caused by an Employee" language in widely differing fashions. *Compare Empire Bank*, 27 F.3d at 335 ("[T]he bond language excludes losses caused by a bank employee, whether negligent or not."), *with Manitowoc*, 485 F.3d at 980 (holding Exclusion H does not apply where employees were merely negligent). The bond itself does not define the term. The term "caused" is ambiguous. Georgia law requires courts to construe ambiguous terms in insurance against the insurer. *ALEA London Ltd. v. Woodcock*, 286 Ga.App. 572, 649 S.E.2d 740, 745 (2007). Courts must likewise construe exclusions from coverage against the insurer. *Id.*

Facing unsettled legal territory and mindful of Georgia principles of insurance contract interpretation, the Court concludes that the ambiguous causation standard must be strictly construed against Cincinnati. Exclusion H does not exclude coverage based on ordinary employee negligence. It excludes coverage only if an employee acts with knowledge of or intent to further a forgery, or intentionally disregards relevant bank policies. *See Empire Bank*, 27 F.3d at 335 (holding loss was "caused" by an employee who ignored bank policies by instructing subordinates to cash corporate checks without proper documentation); *cf. Citibank Tex., N.A. v. Progressive Cas. Ins. Co.*, 2006 WL 3751301, at *6 (N.D.Tex. Dec. 21, 2006) (refusing to apply Exclusion H where there was no evidence "of employee collusion or of intentional disregard of bank policy"), *rev'd on other grounds*, 522 F.3d 591 (5th Cir.2008).

▇▇ Even under this heightened standard of causation, however, Brittain caused the loss. There is no genuine dispute that Brittain intentionally disregarded NCB policy at closing, both by falsifying settlement statements and by improperly disbursing funds to Grant. The FDIC itself averred that Brittain acted "in violation of NCB's instructions" at closing. The FDIC's Rule 30(b)(6) designee testified that Brittain's conduct was "in violation of the closing instructions that [NCB] gave to Brittain and his firm."

The FDIC has failed to present evidence creating a genuine dispute of material fact as to Brittain's intentional disregard of NCB's policies. The only evidence the FDIC presents regarding Brittain's conduct at closing is the deposition of Michael White, whom NCB retained to pursue collection litigation against Grant after the Orchard Road loan defaulted. White interviewed Brittain on September 25, 2008 about the closing. White testified that Brittain reacted with "bewilderment" when questioned about his conduct at the Orchard Road loan closing. This does not create a dispute of material fact as to whether Brittain intentionally disregarded NCB policy. Even construing White's tes-

timony in the FDIC's favor, it only speaks to Brittain's frame of mind when confronted two years later about the irregularities surrounding the Orchard Road closing. It does not controvert the FDIC's own averments and testimony that Brittain intentionally disregarded NCB policy at closing.

The FDIC's argument that Exclusion H is invoked only if Brittain had actual knowledge of the forgery and intentionally misled NCB at closing is unavailing. Brittain disregarded NCB's specific instructions to close the Orchard Road loan according to the terms of the loan approval. This is sufficient to find that his conduct "caused" the loss. *See Empire Bank,* 27 F.3d at 335 (holding an employee caused a bank's loss under Exclusion H where he instructed his subordinates to ignore bank procedures). Cincinnati need not show that Brittain was a participant in the forgery. Intentional violation of NCB policies is enough to show he caused the loss for the purpose of Exclusion H.

A reasonable jury could find only that Brittain intentionally disregarded NCB policies at closing. His disregard of NCB policies was a direct cause of the loss. Without him, the Orchard Road loan would not have closed in contravention of NCB policies. He was an NCB employee, and his conduct caused NCB's loss. Exclusion H bars the FDIC's claim.

The FDIC's breach of contract claim fails for three reasons. It cannot show that Insuring Agreement E covers the Orchard Road loan loss because it did not act in good faith in making the loan. It cannot show that it satisfied Condition B by discovering the loss after the bond's effective date. Finally, Cincinnati has shown that Exclusion H applies to exclude the loss from coverage because Brittain caused the loss.

#### d. Damages

The FDIC's breach of contract claim fails as a matter of law. Accordingly, the Court will not address the proper measure of damages for that claim.

### 2. Pre–Judgment Interest and Attorneys' Fees

Similarly, the FDIC's ancillary claims for pre-judgment interest and attorneys' fees are necessarily DENIED.

### III. Conclusion

DEFENDANT'S motion for summary judgment [60] is GRANTED. PLAINTIFF'S motion for summary judgment [51] is DENIED. The Clerk is DIRECTED to close the case.